DE ZOTELL, Respondent, v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK (BURTCH, Intervenor), Appellant.

(245 N. W. 58.)

(File No. 6977. Opinion filed November 15, 1932.)

*Frederick L. Allen,* of New York City, and *Bailey & Voorhees* and *Ray F. Bruce,* all of Sioux Falls, for Appellant.

*Conway, Feyder & Conway,* of Sioux Falls (*Tom Kirby,* of Sioux Falls, of counsel), for Respondents.

CAMPBELL, P. J. January 3, 1928, Roy G. De Zotell effected a policy of insurance upon his life with defendant company in the amount of $2,000, paying the first annual premium thereon of $27.56, naming his wife, Elnora De Zotell, plaintiff herein, as beneficiary, and reserving to himself the right to change beneficiaries from time to time as he might desire. On August 9, 1928, Elnora De Zotell feloniously shot and killed her husband, the insured, and was subsequently convicted of first degree manslaughter. Roy De Zotell died intestate, leaving him surviving, in addition to his widow, his mother, two brothers, and two sisters; and the intervener Burtch was duly appointed administrator of his estate. The assets of the estate amounted to $500; claims of creditors and expenses of administration aggregated $1,650.

Subsequent to her conviction of manslaughter, plaintiff instituted this action to recover upon the insurance policy. The administrator, Burtch, intervened, and asked that plaintiff take nothing and that the amount of the policy be paid to him as administrator. Findings and conclusions below were in favor of intervener, and it was adjudged that the intervener, as administrator of the estate of the insured, recover the full face value of the policy with interest, and that the plaintiff take nothing. From this judgment and from a denial of its application for new trial, defendant insurance company has appealed.

This case tenders for consideration several phases of a problem that has been more or less frequently before the courts. It is unquestionably a shocking and abhorrent thing that a sane, felonious killer (or his heirs) should acquire money or property as a

result of his crime. The principles which forbid such unconscionable enrichment of the criminal are implicit in the ancient common-law maxim "Nullus commodum capere potest de injuria sua propria" (Co. Litt. 148 b) anglicized as section 49 of our 1919 Code providing that "no one can take advantage of his own wrong." These principles require no exposition, and are supported by an almost imperative public policy. A situation seeming to demand their application arises when a beneficiary feloniously killing an insured seeks recovery on the policy, and also when an heir feloniously killing an ancestor seeks to take from said ancestor by will or descent. Frequently, as in the instant case, elements of both these situations are involved in a single case by reason of the fact that the beneficiary named in the insurance policy is also an heir or devisee of the victim.

So far as concerns the question of collection of insurance money by a sane beneficiary who has feloniously killed the insured, the courts have had no difficulty. As stated by Mr. Justice Field (Mut. Life Ins. Co. v. Armstrong [1886] 117 U. S. 591, 6 S. Ct. 877, 881, 29 L. Ed. 997) : "It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken." With a possible exception where the policy contains a valid incontestability clause (cf. Lee v. Southern Life & Health Ins. Co. [1923] 19 Ala. App. 535, 98 So. 696) the courts have been unanimous in holding, wherever and whenever the matter has been presented to them, that a sane, felonious killer cannot recover insurance money on the life of his victim. See Cooley's Briefs on Insurance (2d Ed.) p. 5227 et seq.; Couch, Cyc. Ins. Law, § 342; cases collected in notes, 7 A. L. R. 829; 27 A. L. R. 1521; 70 A. L. R. 1539.

"While there is a difference of opinion among the courts of other states as to whether or not a murderer can inherit from his victim under statutes containing no exceptions, there is no such difference of opinion as to the effect of the murder of an insured person by the beneficiary named in an insurance policy. In fact, although the plaintiff's counsel has shown great diligence, he has been unable to find a single case in which a beneficiary has been permitted to recover upon a life insurance policy when he has murdered the insured. Decisions to the contrary are innumerable."

Swavely v. Prudential Ins. Co. (1931) 157 A. 394, 395, 10 N. J. Misc. 1.

As a corollary to the rule that the beneficiary in such cases could not recover on the insurance policy, there has developed since 1892 a view that the incapacity of the named beneficiary should not excuse the insurance company from paying the insurance money to some one, and it has been quite generally held (as we will notice in more detail hereinafter) that the insurance money should be paid to the estate or the other heirs of the insured.

Appellant does not appear very seriously to question the propriety of the view that incapacity of the beneficiary to take in these cases should not, as a general rule, excuse the insurance company from paying some one. But appellant points to those portions of section 701, subd. 2, Rev. Code 1919, as amended by chapter 186, Laws 1923; section 2661, Rev. Code 1919, as amended by chapter 148, Laws 1923, and section 9310, Rev. Code 1919, which read respectively as follows:

"If the decedent leaves no issue and the estate does not exceed in value twenty thousand dollars, all the estate goes to the surviving husband or wife. * * *"

"The proceeds of any insurance upon the life of any person, residing in this state at the time of his death and who leaves a surviving widow, husband, or minor child or children, payable upon his death to his order or to the order of his assigns, estate, executor or administrator, and not assigned to any other person, shall, to any amount not exceeding Five Thousand Dollars ($5,000.00) inure to the use of such surviving widow, husband, minor child or children; and to such amount shall not be subject to the payment of any debt of such decedent, or of such surviving widow, husband, minor child or children."

"The proceeds of a policy of insurance, to the extent of five thousand dollars, on the life of an individual, in the absence of an agreement or assignment to the contrary, shall inure to the separate use of the husband or wife and children of such individual, independently of his creditors; and of an endowment policy payable to the assured on attaining a certain age, to the amount of five thousand dollars, shall be exempt from any of his debts, and the avails of any life insurance, or any other sum of money, not

exceeding in amount five thousand dollars, made payable by any mutual aid or benevolent society upon the death of a member of such society, are not subject to the debts of the decedent."

—and urges that, if the administrator is allowed to recover in this particular case, then by virtue of those statutes the insurance proceeds will necessarily pass from the administrator to the plaintiff (who admittedly cannot recover on the policy), and plaintiff will thereby be permitted to do indirectly what she cannot do directly. It is principally upon this ground that appellant urges that the judgment for recovery by the administrator should be reversed. Respondent administrator points to the general line of authorities allowing recovery upon the policy in behalf of the estate or other heirs of the insured when the beneficiary has incapacitated himself from recovery, and urges the question of the ultimate disposition of the insurance proceeds, after the same come to the hands of the administrator, is not material to the decision of the pending case, but will be a question subsequently to be determined by the county court as part of its proper functions in connection with the administration of the Roy De Zotell estate. We cannot acquiesce in the view of respondent that the question of what may become of the insurance proceeds in the hands of the administrator is immaterial in this case, for this reason: We are of the opinion, as will be more fully hereinafter stated, that the doctrine which permits recovery by the administrator or other heirs of the insured in cases where the named beneficiary is incapacitated to recover on the policy because of felonious killing is and must be founded upon the express condition precedent that the named beneficiary will not profit thereby. It follows that we ought not to affirm any judgment for the payment of this insurance money to the administrator of the insured or to any one else, unless it be demonstrably certain that such payment will not in any manner result in permitting the wrongdoing beneficiary to participate in the proceeds either directly or indirectly. We think, therefore, that we must examine into the whole matter somewhat further.

Many legal scholars and theorists have urged with considerable force the view that cases of this kind (both with relation to recovery of insurance money and concerning taking by will or succession) present an ideal situation for the establishment of a constructive trust. A constructive trust, as pointed out by Dean Pound (33

Har. Law Rev. 420), is purely a remedial institution. Or, in the words of Mr. Justice Cardozo (Beatty v. Guggenheim Exploration Co. [1919] 225 N. Y. 380, 122 N. E. 378, 380), " * * * [it] is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Pursuant to this theory, the wrongdoer would take the legal title, whether of the insurance money or of property passing by will or succession, not beneficially, but upon a constructive trust for the use of the estate of insured, or his other heirs. The theory has much to recommend it. It was the view suggested by the late James Barr Ames (36 Am. Law Reg. [N. S.] 225), and is strongly advocated by the younger Pomeroy. See Pomeroy's Eq. Jur. (4th Ed.) § 1054, and particularly note b, page 2408 at page 2411. See, also, 9 Ill. Law Rev. 502, 505, 538; 29 Mich. Law Rev. 745; 4 Harv. Law Rev. 394; 8 Harv. Law Rev. 170; 24 Harv. Law Rev. 227; 27 Harv. Law Rev. 280; 28 Harv. Law Rev. 426; 30 Harv. Law Rev. 622. Conceding the logic of the theory, and conceding that the application of the constructive trust method to the solution of these cases might frequently permit more satisfactory results and avoid some of the difficulties often encountered, nevertheless this method has not seemed to meet with general approval of the courts. It is urged in the very careful and able dissenting opinion of Elliott, J., in Wellner v. Eckstein (1908) 105 Minn. 444, 117 N. W. 830, and seems to find some recognition in the holdings of Ellerson v. Westcott (1896) 148 N. Y. 149, 42 N. E. 540; Van Alstyne v. Tuffy (1918) 103 Misc. 455, 169 N. Y. S. 173; Bryant v. Bryant (1927) 193 N. C. 372, 137 S. E. 188, 51 A. L. R. 1100; and Barnett v. Couey (1930) 224 Mo. App. 913, 27 S. W. (2d) 757, the last three of which deal with tenancies by the entirety. The general course of the decisions, however, has been not to permit the wrongdoer to take legal title and impose a constructive trust thereon, but to bar the taking by the wrongdoer of any title at all, either legal or equitable, whenever it has seemed that this could lawfully be done. As hereinbefore stated, the courts have had no difficulty in these cases in preventing the criminal beneficiary from recovering upon an insurance policy upon the life of his victim. The decisions seem to be unanimous. The matter rests in contract,

and the courts have had no hesitancy in refusing to enforce the contract at the instance of the criminal.

But, when the situation presents itself in the form of a question as to whether or not an heir who has murdered his ancestor can take from such ancestor by will or succession, we find some diversity of opinion. Every argument of sound public policy and good conscience which is valid against permitting the felonious killer to collect insurance money is admittedly of equal validity against permitting him to take from his victim by will or descent. The matter is governed by statute in most of the Continental countries, and is now controlled by statute in a substantial number of our own states; the general tenor and effect of the statutes being to bar the taking in such cases though the various statutes are by no means identical in terms. See California, section 1409, Civ. Code (now Probate Code, § 258); Colorado, chapter 195, p. 712, Laws 1923; Indiana, section 2995, Burns' Ann. Stat. 1914; Iowa, section 12032, Code 1927; Kansas, section 3856, Gen. Stat. 1915; Louisiana, Rev. Civ. Code 1924, arts. 966, 1560, 1710; Minnesota, Laws 1917, ch. 353; Mississippi, Code 1927, § 3580; Nebraska, Comp. Stat. 1922, § 1238; North Carolina, Consol. Stat. 1919, §§10, 4099; North Dakota,Comp.Laws 1913,§5683; Oklahoma,Comp. Stat. 1921, § 11319; Pennsylvania, Stat. 1920, § 8334 (20 PS § 244); South Carolina, Act of March 26, 1924, 33 Stat. at Large, p. 1188; Tennessee, chapter 11, Acts 1905; Utah, Comp. Laws 1917, § 6403; Virginia, Code of 1924, § 5274; Wyoming, Comp. Stat. 1920, § 7010. Where such taking is not barred by a specific statute, however, and the matter rests entirely upon judicial decision, the cases are not in agreement. In England (28 Halsbury Laws of Eng., p. 539; Cleaver v. Mut. Reserve, etc. [1892] 1 Q. B. 147; Estate of Crippen [1911] Probate 108; Re Hail [1914] Probate 1; In re Houghton [1915] 2 Ch. 173; Re Pitts [1931] 1 Ch. 546) and in Canada (Lundy v. Lundy [1895] 24 Can. S. Ct. Rep. 650; Re Mediaini [1927] 4 Dom. Law Rep. 1137), it is held that the sane heir feloniously killing his ancestor cannot take from that ancestor by will or descent.

In the United States the numerical weight of authority appears to preponderate slightly in favor of the view that the heir in such case is not precluded from taking by will or succession. Practically all of the American cases down to 1927 are collected in the notes

to be found in 2 Ann. Cas. 658; 14 Ann. Cas. 99; Ann. Cas. 1916A, 680; 25 L. R. A. 564; 3 L. R. A. (N. S.) 726; 39 L. R. A. (N. S.) 1088; L. R. A. 1915C, 328, and 51 A. L. R. 1096. The matter has been subsequently dealt with in Re Wilkins' Estate (1927) 192 Wis. 111, 211 N. W. 652, 51 A. L. R. 1106; Garwols v. Bankers Trust Co. (1930) 251 Mich. 420, 232 N. W. 239; Parker v. Potter (1931) 200 N. C. 348, 157 S. E. 68. It is perhaps worthy of note that, in the three cases last above cited and in Re Tyler's Estate (1926) 140 Wash. 679, 250 P. 456, 51 A. L. R. 1088, being the four jurisdictions which have most recently considered the question, the courts have adopted what had generally been previously stated as being the minority view. The basis of the decisions permitting the heir to take under such circumstances is that the matter rests upon statute (not as in the case of the insurance policy upon contract); that the statutes of wills and descent are clear and unambiguous in terms and contain no exceptions, and that it amounts to unwarranted judicial legislation for the courts, upon grounds of public policy, to create an exception in the case of a murderer. See Shellenberger v. Ransom on rehearing (1894) 41 Neb. 631, 59 N. W. 935, 25 L. R. A. 564, which is an early and much-cited case supporting this view. In some of these decisions (e. g., Carpenter's Estate [1895] 170 Pa. 203, 32 A. 637, 29 L. R. A. 145, 50 Am. St. Rep. 765; Wall v. Pfanschmidt [1914] 265 Ill. 180, 106 N. E. 785, L. R. A. 1915C, 328, Ann. Cas. 1916A, 674) it is suggested that to refuse to permit the heir to take would amount to an unconstitutional attainder or forfeiture or corruption of the blood. It rather appears that this position lacks adequate support, particularly in view of the fact that statutes accomplishing the identical result are held valid. See Hamblin v. Marchant (1918) 103 Kan. 508, 175 P. 678, 6 A. L. R. 1403. Cf. also Perry v. Strawbridge (1908) 209 Mo. 621, 108 S. W. 641, 16 L. R. A. (N. S.) 244, 123 Am. St. Rep, 510, 14 Ann. Cas. 92; Box v. Lanier (1904) 112 Tenn. 393, 79 S. W. 1042, 64 L. R. A. 458.

It seems quite plain upon a careful reading of the cases that the real foundation of the so-called American majority rule is that the matter is for the Legislature and not for the courts, and that, where the Legislature has enacted a clear and unambiguous statute of wills or statute of descent containing no exception, however un-

conscionable and contrary to public policy it may be to permit a murderer to take from his victim by will or descent, the courts are powerless to prevent it. This court has never had occasion to pass upon the question, and, without any expression of opinion thereon, we desire to leave this phase of the matter for the moment and turn to a further consideration of the insurance proposition, and particularly of the doctrine that incapacity of the named beneficiary to take because of felonious killing of the insured does not excuse the insurance company from paying someone.

The first case to promulgate this view, so far as we have discovered, was Cleaver et al v. Mut. Reserve Fund Life Ass'n [1892] 1 Q. B. 147, growing out of the famous Maybrick murder case. James Maybrick in his lifetime took out an insurance policy with the defendant association, which thereby promised, upon his death, to pay the policy money to his wife, Florence, if then living, otherwise to his legal personal representatives. In 1889 Florence Maybrick murdered her husband, and was sentenced to death, which sentence was afterward commuted to imprisonment for life. James Maybrick left a will naming Thomas and Michael Maybrick as executors. After the murder, Florence Maybrick, assigned all her interest in the policy to Cleaver, and, after she commenced the service of her sentence, Cleaver was appointed administrator of her property and effects, under 33 and 34 Vict. c. 23, § 9 (Law Rep. Stat. 1870, p. 197). The action against the insurance company was brought by Cleaver, as assignee and administrator of the goods of Florence Maybrick, and by Thomas and Michael Maybrick, as executors of James Maybrick, separate plaintiffs. The lower court held that there should be no recovery, but upon appeal it was held that, although Cleaver, as representing the interests of Florence Maybrick, could take nothing, yet the executors should recover. It is to be observed in this case that the executors were proper party plaintiffs in any event, even though the named beneficiary was living, and even if she had not disqualified herself to take. As the court points out, the contract was with the insured husband. By the law of England at that time the beneficiary could not maintain an action against the company in her own name on the insurance policy but the cause of action on the death of the insured would vest in his executors or administrators, although by virtue of section 11 of the Married Women's Property Act of 1882 (45

and 46 Vict. c. 75, Law Rep. Stat. 1881-82, p. 454) it would have been the duty of the executors to hold the money in trust for the named beneficiary if she were qualified to take. The court announced in Cleaver's Case that the executors were entitled to recover, that the trust imposed by statute in favor of the beneficiary on the money in their hands would fail because of her felonious killing of the insured, and that the executors would hold the money upon a resulting trust for the estate of the insured. The court squarely held (though it was perhaps to some extent obiter in the case) that, when the executors, who under any circumstances were admittedly the persons entitled to collect this insurance money, received the same, they would hold it for the estate of the insured and not for the named beneficiary, as would have been the case if she had not forfeited her rights by her misconduct; Lord Esher stating in this connecton as follows: "The defendants must pay the money to the executors, and then it will be for the executors to deal with it according to their duty as executors. They would be trustees of it for the wife if she had not forfeited it; but her interest being forfeited, it forms part of the insured's estate. If there are creditors, it will go to them so far as may be necessary to satisfy their claims. If anything is left, it will go to the children of the insured if there are any. The rule of public policy in such a case prevents the person guilty of the death of the insured, or any person claiming through such person, from taking the money."

That the court permitted recovery by the executors in this case upon the express condition precedent that the wrongdoing beneficiary would not be benetfied thereby either directly or indirectly is further apparent from the language of Lord Esher when he stated: "That the person who commits murder, or any person claiming under him or her, should be allowed to benefit by his or her criminal act, would no doubt be contrary to public policy. But this doctrine ought not to be stretched beyond what is necessary for the protection of the public; and, if the matter can be dealt with so that such person should not be benefited, I do not see any reason why the defendants in such a case should be allowed to say, though they might have received premiums perhaps for thirty years and still retained the same, that public policy forbade their paying the sum of money which they had contracted to pay."

Subsequently to the decision in Cleaver's Case the doctrine there announced that the incapacity of the named beneficiary to take would not excuse the insurance company from paying has come to be the general rule in this country. See Couch on Insurance, § 342, and cases cited. See, also, note, L. R. A. 1917B, page 671, note, 70 A. L. R. page 1539. That Cleaver's Case is the foundation case for this view is evidenced by the fact that practically every American decision on the point either directly cites and relies upon Cleaver's Case (cf. Schmidt v. Northern Life Ass'n [1900] 112 Iowa, 41, 83 N. W. 800, 51 L. R. A. 141, 84 Am. St. Rep. 323; Supreme Lodge Knights & Ladies of Honor v. Menkhausen [1904] 209 Ill. 277, 70 N. E. 567, 65 L. R. A. 508, 101 Am. St. Rep. 239; Sharpless v. Grand Lodge A. O. U. W. [1916] 135 Minn. 35, 159 N. W. 1086, L. R. A. 1917B, 670), or cites and relies upon other cases which have so done. It does not seem inequitable in these cases to hold that the insurance company ought not to receive an unearned gratuity by being excused from all payment whatsoever solely because of the wrongdoing of the named beneficiary. It seems fair and reasonable to treat the matter, so far as concerns the insurer, substantially as though the named beneficiary had died prior to the death of the insured and no successor had been designated. And that is the fashion in which the matter has been dealt with by the decisions practically without exception since Cleaver's Case. The case of Spicer v. N. Y. Life Ins. Co. (1920, C. C. A. 5th Circuit) 268 F. 500 (certiorari denied, 255 U. S. 572, 41 S. Ct. 376, 65 L. Ed. 792; for opinion in the District Court, see Id., 263 F. 764) is distinguishable on the form of policy involved, which was a double policy on two lives, the survivor to take, and the rights of the beneficiaries vesting at the execution of the policy beyond power of change as to either except by mutual consent. See discussion and approval of this case 5 Minn. Law Rev. 396, and criticism thereof, 34 Harv. Law Rev. 788. Cases such as Goldstein v. N. Y. Life Ins. Co. (1928) 133 Misc. 106, 231 N. Y. S. 161 (modified on other grounds, Id., 225 App. Div. 642, 234 N. Y. S. 250), where the entire scheme from the moment of procuring the insurance was a conspiracy between the insured and the beneficiary to defraud the insurer (though the insured intended merely to disappear and did not contemplate that his beneficiary would actually murder him), are likewise distinguishable. The

general rule, however, is that the insurer should pay some one and the cases have not seemed to draw any very careful distinction as to whether the money should go to the estate of the insured or to his heirs and next of kin other than the wrongdoing beneficiary. Probably in the usual case it is not very material whether the taking is by the administrator or the other heirs, particularly in those jurisdictions where it is the law, either by statute or judicial decision, that an heir cannot take by descent from an ancestor whom he has feloniously killed; for in those jurisdictions there is no danger or possibility that payment to the estate or administrator of the insured may permit the wrongdoing beneficiary to participate in the proceeds as an heir.

We come then to this question. How about recovery of insurance money by the administrator of the insured in case the named beneficiary (who cannot recover on the policy because he has feloniously killed the insured) happens also to be a distributee or the sole distributee of the estate of the insured, in a jurisdiction where an heir who murdered his ancestor is not barred from taking by descent? We have not discovered any very considerable number of cases dealing with such a situation, and those that we have found appear to be conflicting. On the one hand is the decision of the Court of Civil Appeals of Texas in Murchison v. Murchison (1918) 203 S. W. 423. The court held that the wrongdoing beneficiary could not recover on the insurance policy. It then proceeded to hold, first, that the estate of the insured could recover upon the policy; and, second, that when the estate of the insured did so recover, the wrongdoing beneficiary, by virtue of statute, would take the entire insurance proceeds free of claims of creditors and other heirs. In Nat. Benefit Life Ins. Co. v. Davis (1929) 38 Ohio Ap. 454, 176 N. E. 490, 492, an intermediate Ohio court appears to follow the doctrine of the Murchison Case (though not citing that case or any other on the point), and holds that the administrator of insured may recover, even though the murderer may get a partial distributive share after payment of debts and costs of administration, saying: "That the person who caused the death of the husband [insured] incidentally gets something is no legal reason why the estate should not recover." In Equitable Life Assur. Soc. v. Weightman (1916) 61 Okl. 106, 160 P. 629, L. R. A. 1917B, 1210, the court, in holding

that the insurance money should go to the estate of the insured, said that it was immaterial that the wrongdoing beneficiary might inherit part of the money as heir, if not otherwise disposed of by the administrator. On the other hand, a directly opposite result has been reached in Johnston v. Metropolitan Life Ins. Co. (1919) 85 W. Va. 70, 100 S. E. 865, 7 A. L. R. 823 (followed and approved in Wickline v. Phoenix Mut. Life Ins. Co. [1928] 106 W. Va. 424, 145 S. E. 743; discussed and approved also in 18 Mich. Law Rev. 430). It was the rule in West Virginia, in accord with the numerical weight of American authority, that an heir murdering his ancestor could nevertheless take by succession. The court pointed out that the proceeds of the insurance were no part of the estate of the insured at the time of his death, and would never become a part of such estate, and thus available to the wrongdoing heir, unless the court made them so by compelling the insurance company to pay the estate when the beneficiary and heir was incapacitated to recover on the policy. The West Virginia court, admitting that they were helpless to prevent actual estate from passing to the heir under the statutes of succession, held nevertheless that the court was under no obligation by judicial decision to create an estate or augment an existing estate for the wrongdoer, and refused to allow recovery by the administrator and excused the insurance company from any payment whatsoever rather than arrive at the result reached by the Murchison Case, supra. It seems to us that the result reached in the Murchison Case (which incidentally was a decision of an intermediate court of three judges, only two of whom were sitting) is indefensible from any point of view. The Ohio and Oklahoma decisions of the same tenor are equally objectionable, save that in actual operation they are not quite so offensive because, under the facts of those cases, the wrongdoing beneficiaries would apparently receive only part of the money rather than all of it as in the Murchison Case. The Texas, Oklahoma, and Ohio decisions all appear to overlook or absolutely to disregard the fact that the doctrine of compelling the insurance company to pay some one else when the beneficiary has incapacitated himself was based fundamentally in Cleaver's Case, where it originated, upon the express condition that payment could be ordered in such manner and fashion that the wrongdoer would not be benefited thereby. To hold that public policy forbids recovery

by the wrongdoer from the insurance company, and then, in the next breath, to order payment to the estate and permit the wrongdoer to take the whole proceeds of such payment from the estate, seems a solemn and circuitous legal absurdity. Certainly it is just as contrary to public policy for the wrongdoer to get this money indirectly as . directly. It seems clearly apparent that the same sound public policy which requires that the insurance company be excused from paying the wrongdoer, demands equally that the insurance company be excused from paying any one else, if the necessary result of such payment will be that the wrongdoer gets the money. The statement frequently seen in the cases that there is no public policy which requires that the insurer should be excused from paying is and must be conditioned on the assumption that payment can be made in such manner that the wrongdoer cannot participate, for, except upon that condition, this statement is not true. The whole matter resting in contract, if choice must be made between benefiting the wrongdoer, whether directly or indirectly, or gratuitously excusing the insurer entirely, there can be no question but that public policy dictates the latter course. If we were required to choose between the result reached by the Texas court and that reached by the West Virginia court, we would unhesitatingly accept the view of the West Virginia decisions.

 At this point, before endeavoring further to proceed toward the ultimate disposition of this case, we may profitably epitomize certain general propositions applicable to the problem before us which we deem established law, as indicated by the previous discussion herein. They may be stated about as follows: First, good conscience and sound public policy forbid that a sane, felonious killer should profit by his crime. Second, when the profit is to accrue by virtue of a contract, as upon an insurance policy, no legal difficulty is encountered which prevents barring the wrongdoer from recovery. Third, generally speaking, the incapacity of the wrongdoer to recover on an insurance contract should not excuse the insurer from paying if payment can properly be ordered in such manner that the wrongdoer will not profit. Fourth, it is better that the insurer should be entirely excused from payment (with a duty of refunding to the estate of the insured the amount by which premiums paid exceed the cost of carrying the insurance) than that the wrongdoer should profit directly or indirectly from

such payment. Fifth, whether the courts, in pursuance of a sound public policy (lacking a specific statute so authorizing), can prevent profit from his crime to the wrongdoer accruing by virtue of statute, such as a statute of wills or of descent, is a controverted question which has not been passed upon in this state. Sixth, even if the courts cannot prevent the wrongdoer from taking by descent, nevertheless they are under no obligation to create an estate for the wrongdoer by decreeing payment to an administrator if the result of such payment will be that the wrongdoer will ultimately profit thereby.

Recovery below was adjudged in favor of the administrator qua adminsitrator. Under the facts of this case (leaving out of the case entirely for the moment the fact of the felonious killing) and under the statutory law of this state hereinbefore cited, this insurance money if collected by the administrator of Roy De Zotell, deceased, as administrator, would go to Elnora De Zotell, the surviving widow, exempt from claims of creditors and free of any claims of other heirs or next of kin. Skinner v. Holt (1896) 9 S. D. 427, 69 N. W. 595, 62 Ah. St. Rep. 878; Meyer v. Meyer (1910) 25 S. D. 596, 127 N. W. 595; Re Carlon (1911, Dist. Ct. S. D.) 189 F. 815; Magnuson v. Wagner (1924, C. C. A. 8) 1 F. (2d) 99; First Nat. Bk. v. Halstead (1930) 56 S. D. 422, 229 N. W. 294; Mason v. Martin (1930) 57 S. D. 299, 232 N. W. 29.

Replacing in the situation the factor of the felonious killing of the insured by the beneficiary, which we arbitrarily excluded from consideration for the moment for the purposes of the previous paragraph, our inquiry may now be stated as follows: It is clear that but for the felonious killing Elnora De Zotell would take from the administrator any insurance money which he might be able to collect from any insurer up to $5,000. As a matter of law, does such felonious killing (which admittedly bars her from direct recovery on a policy in her favor) bar Elnora De Zotell from taking such insurance money from the hands of the administrator by virtue of statute?

It should be noted that it is immaterial whether the passing of the money to Elnora De Zotell from the administrator would be by virtue of a general statute of descents or by virtue of a special statute relating to insurance money such as section 2661, Rev. Code

1919, as amended by chapter 148, Laws 1923, or section 9310, Rev. Code 1919. The principle involved is identical in either case, and the statutes last above mentioned, while in some respects in the nature of exemption statutes, partake also of the nature of special statutes of descent and succession. See White v. Bickford (1922) 146 Tenn. 608, 244 S. W. 49, 26 A. L. R. 129.

In order to answer the inquiry last above propounded, and thereby determine the proper disposition of the instant case, we must now revert to a further consideration of the general question which we left without any statement of our own view thereon at an earlier point of this opinion after setting forth the present state of the authorities pro and con; namely, can a sane heir who feloniously kills an ancestor take from such ancestor by descent or succession? If we answer that question in the affirmative for this jurisdiction, then, since we accept the view of the West Virginia court in Johnston v. Metropolitan Life Ins. Co., supra, that it is better to excuse the insurer from payment entirely than that the wrongdoer should indirectly profit, we would be compelled to hold that the administrator qua administrator could not recover this insurance money. We might then face an inquiry as to whether payment could be ordered, not to the administrator as such or to the estate of the insured, but to the heirs of the insured, other than the wrongdoing beneficiary. Cf. Ill. Bankers' Life Ass'n v. Collins (1930) 341 Ill. 548, 173 N. E. 465. And, if it were held that such heirs could recover, then it might be an interesting question whether they themselves must sue on the policy or whether the administrator of the insured might recover in their behalf, not as administrator or for the estate of the insured, but as a quasi trustee for such heirs taking, not by descent, but as beneficiaries of the policy. Cf. Clarke v. Schwarzenberg (1894) 162 Mass. 98, 38 N. E. 17; Pfeifer v. Supreme Lodge (1903) 173 N. Y. 418, 66 N. E. 108; Contra, Devaney v. Ancient Order, etc. (1913) 122 Minn. 221, 142 N. W. 316. On the other hand, if we answer the question in the negative, then the judgment below awarding recovery to the administrator qua administrator may be affirmed, since it will be impossible for the wrongdoing beneficiary to profit thereby directly or indirectly.

We have devoted no inconsiderable time to a careful examination of the conflicting authorities. The matter has been much

argued in the reports, and we have hereinbefore cited all the cases dealing with it or the notes where such cases are collected so far as we have been able to find them. In those cases the divergent views on the point are fully exemplified. We could not hope by anything we might be able to say in this opinion to make any original or valuable contribution to the controversial literature of the topic. We therefore content ourselves with the statement that in our opinion the sounder reason supports the view of the English and Canadian cases and those American decisions which, while slightly in the numerical minority at present, seem to be displaying a tendency toward becoming the majority view and which hold that the heir in such cases is barred from taking. We think that the principle of sound public policy which demands that a sane, felonious killer should not profit by his crime should be applied as often as and whenever any claim is made by such killer, whether under contract, will, or statute. The decisions which we prefer to follow attain the result which everyone (and even the cases holding the contrary) admits ought to be attained if possible. We cannot accept as well grounded the argument that such decisions amount to unwarranted judicial interference with legislative action. To discuss the point further or to quote from the opinions would not be profitable. In support of the position we are taking, we cite particularly the following: Perry v. Strawbridge (1908) 209 Mo. 621, 108 S. W. 641, 16 L. R. A. (N. S.) 244, 123 Am. St. Rep. 510, 14 Ann. Cas. 92; Slocum v. Metropolitan Life Ins. Co. (1923) 245 Mass. 565, 139 N. E. 816, 27 A. L. R. 1517; Re Tyler's Estate (1926) 140 Wash. 679, 250 P. 456, 51 A. L. R. 1088; Garwols v. Bankers' Trust Co (1930) 251 Mich. 420, 232 N. W. 239; Parker v. Potter (1931) 200 N. C. 348, 157 S. E. 68. We cannot persuade ourselves that there was ever any legislative intent that our statutes of descent and succession, general or special, however broad and unambiguous and lacking in exceptions in their terms, should operate in favor of a sane, felonious killer. We announce it as the law of this state that such statutes will not be permitted so to operate unless and until the Legislature shall specifically and affirmatively so enact.

█ It follows from this view that the plaintiff Elnora De Zotell cannot take or receive any part of this insurance money from the administrator of the insured or from his estate by virtue

of any statute, general or special. There being no surviving child of the insured, the insurance money, when received by the administrator, will go as general assets of the estate, first, and insofar as may be necessary, to the payment of claims of creditors and expenses of administration, and then, pursuant to the general statutes of descent, to the heirs at law of the insured in like manner as would be the case if Elnora De Zotell had predeceased the insured and had died intestate and without heirs. Inasmuch therefore as the judgment appealed from in favor of the administrator as such will not and cannot profit the wrongdoing beneficiary directly or indirectly, it is affirmed.

POLLEY, ROBERTS, WARREN, and RUDOLPH, JJ., concur.