**In the Matter of the ESTATE of Walter A. GIBBS, Deceased.**

Nos. 17336, 17779, 17782, 17805, 17816.

Supreme Court of South Dakota.

Argued May 26, 1992.
Decided Sept. 2, 1992.

George Beal, Rapid City, for Will Contestant and appellant, Bernice Boettner.

Rick A. Cain of Seiler & Cain, Mobridge, for Will Proponent and appellant, Delores Christenson.

WUEST, Justice.

This case is a consolidation of three appeals arising from the probate of the latest will of Walter A. Gibbs (Gibbs), deceased. After the will was admitted to probate, it was discovered the sole legatee, Delores Christenson (Delores), was involved in the murder of Gibbs, although she was acquitted of all criminal charges. The issues which will be discussed are:

1.  Whether the trial court's determination that Delores was a willful slayer was clearly erroneous.
2.  Whether attorney fees were properly awarded from the estate to Delores, a sole legatee found to be a willful slayer.

We affirm in part and reverse in part.

### BACKGROUND:

Gibbs farmed in Corson County and resided with his mother until 1963, when he hired Delores to help care for her. He married Delores for the first time in 1964, and in 1973, they moved to Lemmon, South

Dakota. Soon after, they divorced. Gibbs and Delores remarried in 1977 and divorced a second time the same year. In the meantime, Delores married another. Delores' only child, Robyn, was born of this marriage. Gibbs then married Delores' twin sister, Darlene Wahl (Darlene), but that marriage ended in divorce in 1980. He remarried Darlene and divorced her again in December 1983. From late 1984 through March 1985, Delores and Robyn lived at a variety of locations, in North Dakota and South Dakota. Gibbs's last marriage was to June Penny; this union was terminated by divorce in 1986.

## FACTS:

During the 1988/1989 winter, Delores, Robyn, Darlene (now Darlene Phillips) and Darlene's husband, Jerry Phillips (Jerry) (also known as Jerome), who were all living together, experienced very difficult times due to a lack of money. Early in 1989, Delores contacted Gibbs at the Hettinger, North Dakota nursing home where he resided. She offered to move back to Lemmon and care for Gibbs at his home. In February 1989, Delores, Robyn, Darlene and Jerry obtained a key to Gibbs' house and began cleaning and preparing the house for Gibbs' return.

Gibbs returned from the Hettinger nursing home on April 15, 1989. During the next eleven months the group lived in the house as a "family." Delores did most of the cooking and laundry and gave Gibbs regular baths, and Jerry would help Gibbs with such things as getting in and out of the bathtub. Neither Darlene nor Jerry were employed outside the home. Gibbs paid most of the household bills and handled his own personal finances and all matters relating to his farm.

Attorney Curtis Hanks (Hanks) of Lemmon represented Gibbs on all five divorces. He also prepared wills for Gibbs in 1977, 1979, 1982, and two in 1986. All of the wills named Gibbs' first cousin, Bernice Boettner (Boettner), as a beneficiary. In

March 1989, at Gibbs' request, and prior to leaving the nursing home, Hanks drew up a codicil to Gibbs' 1986 will, leaving the home in Lemmon to Delores and the rest of his estate to Boettner. Prior to the codicil, the 1986 will left Gibbs's entire estate to Boettner, unless she predeceased him.

In the latter part of December or early January 1990, Gibbs decided to make a new will. Delores located an attorney who then drafted Gibbs' new will and she procured two witnesses for the will execution. Gibbs' Last Will and Testament disinherited his relatives and left his entire estate, worth approximately $175,000.00, to his former wife Delores. Gibbs executed the new will on January 5, 1990.

Gibbs died testate on April 1, 1990, at the age of 85. Initially, it was thought he died of a heart attack. Delores petitioned for probate of the will. Boettner objected to the petition contending Gibbs was incompetent, lacked testamentary capacity and that the will was executed while Gibbs was subject to duress, fraud and undue influence.

The matter was tried to the court on July 18 and 19, 1990. The trial court found Gibbs was mentally competent; there was no confidential relationship between Gibbs and Delores; and Boettner, the will contestant, failed to establish fraud, duress or undue influence by a preponderance of the evidence. Boettner appealed the trial court's findings to this Court; this appeal, # 17336, is now moot due to later occurrences related below.

In January 1991, Delores, Darlene and Jerry were indicted on charges of conspiracy to murder Gibbs and aiding and abetting first and second-degree murder. Boettner petitioned for revocation of probate on the ground of newly discovered evidence. Under the willful slayer statute, she also petitioned for disqualification of Delores as a beneficiary. Jerry pled guilty to conspiracy to commit second-degree murder. Darlene was convicted of murder and conspiracy to murder and sentenced to life in prison.[1] Delores was acquitted of all charges.

---

1. Darlene's conviction was recently affirmed by this Court. *See State v. Phillips,* 489 N.W.2d 613 (S.D.1992).

The conspiracy originated on January 8, 1990, three days after Gibbs executed the January 1990 will, when Darlene suggested killing Gibbs to "activate the will." This conversation occurred while Darlene and Jerry were driving to Redfield. Delores was not present on the trip. The next conversation occurred in late January or early February at the Gibbs residence when Darlene proposed that they could weaken Gibbs and hasten his death by mixing sleeping pills and nitroglycerin tablets with his tea. Although present during this conversation, Delores made no comment one way or the other. In several later conversations, Darlene again discussed spiking Gibbs' tea with medication, and eventually reported to Jerry and Delores that she had loaded Gibbs' Milk of Magnesia with sleeping pills and prescription medication. Both Jerry and Delores, at this time, were well aware of Darlene's intentions, but Delores had not yet shown any affirmative signs of agreement or assistance. Delores, on at least one occasion, purchased over-the-counter sleeping pills when she refilled Gibbs' prescriptions. The trial court opined it was unclear whether this purchase was at Gibbs' request or at Darlene's. Delores was the only person authorized to charge prescriptions at the drug store and so the trial found her conduct on that occasion would not support any inference of wrongdoing.

The trial court concluded the dispositive evidence of conspiracy on the part of Delores concerned an incident one week before Gibbs' murder. This incident involved Delores, Darlene and Jerry. Darlene suggested smothering Gibbs with a pillow. Without comment, Delores went to her bedroom, returned with a pillow, and handed it to Jerry who held it over Darlene's face to see whether she could breathe.

On Saturday evening, March 31, Darlene announced to the other two that they were going to have to do something to Gibbs if he was still alive in the morning. On the morning of April 1, either Darlene or Delores told Delores' daughter Robyn to take the dogs for a walk. After Robyn left,

Darlene got a pillow from her bedroom and gave it to Jerry. Delores sat at the kitchen table, approximately seventeen feet from Gibbs' bed. Darlene held Gibbs' arms while Jerry smothered him. Had she chosen to do so, Delores could have observed Gibbs' murder. After Jerry removed the pillow, Delores went over and embraced Jerry. Whether this was an expression of grief, regret or victory is unknown, and the trial court was unwilling to draw any inference of wrongdoing from this behavior.

Delores offered the will for probate and testified at the will contest regarding Gibbs' death. She did not disclose the fact of Gibbs' murder until December 17, 1990, when questioned by Agent Overturf (Overturf) of the South Dakota Department of Criminal Investigation (D.C.I.) at the Springfield Correctional Facility.

On May 31, 1991, Boettner filed a petition to revoke the probate of Gibbs' will and an application to disqualify Delores as a willful slayer. After a trial to the court, the trial court denied the petition to revoke probate but disqualified Delores from acquiring property or benefitting from the estate as a willful slayer. Delores appeals from that decision and from several evidentiary rulings made at trial. Boettner filed a notice of review challenging the decision denying her Petition to Revoke Probate of Will. These appeals will be referred to as appeal numbers 17779, 17782. All of the issues raised in these appeals are either moot or without merit except the issue regarding the trial court's determination that Delores was a willful slayer.

Attorney Rick Cain, who represented Delores, itemized his time expended and expenses incurred during both trials to defend the attacks on Gibbs' will. He requested the court approve payment of the fees by the estate and award judgment in favor of the estate and against Boettner. The trial court authorized the estate administrator to pay Cain for the time and expense associated with the two trials. The trial court refused to award judgment in favor of the estate against Boettner pursu-

ant to SDCL 30–7–8.[2] Boettner appeals the award of attorney fees. Delores, by notice of review, appeals the trial court's refusal to award judgment against Boettner. These appeals will be referred to as appeal numbers 17805, 17816. The only issue raised in this third appeal which merits discussion is whether the award of attorney fees was proper.

### STANDARD OF REVIEW:

We first set out the relevant standard of review.

[T]his court will not set aside a trial court's findings of fact unless clearly erroneous. SDCL 15–6–52(a); *In Re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 458 (1970). A finding is not clearly erroneous unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed by the lower court. *In Re Estate of Pierce*, 299 N.W.2d 816, 818–19 (S.D.1980); *In Re Estate of Shabley*, 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971). Additionally, we recognize all conflicts in the evidence must be resolved in favor of the trial court's findings. *In Re Metz Estate*, 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960).

*In re Estate of Till*, 458 N.W.2d 521, 523 (S.D.1990). *Accord In re Estate of Smith*, 481 N.W.2d 471, 473–74 (S.D.1992); *In re Estate of Burk*, 468 N.W.2d 407, 408–09 (S.D.1991).

■ The credibility of witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we accord the trial court some deference based on its observations of the witnesses and the evidence. *Gross v. Gross*, 355 N.W.2d 4, 9 (S.D.1984) (citing *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966)). The same standard applies to this court's review of a trial court's judgment as to the review of a verdict; the evidence will be viewed in a light most favorable to uphold the judgment if there is competent and substantial evidence to support the judgment. *Cf. Estate of Smith*, 481 N.W.2d at 474; *In re Estate of Weickum*, 317 N.W.2d 142, 145 (S.D.1982); *Estate of Hobelsberger*, 85 S.D. at 289, 181 N.W.2d at 458.

Furthermore, in a court trial, '[u]pon review, the evidence and inferences therefrom must be viewed in a light most favorable to uphold the verdict [judgment] and, if there is competent and substantial evidence to support the verdict [judgment], it must be upheld.'

*Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259, 273 (S.D.1985) (quoting *Dougherty v. Beckman*, 347 N.W.2d 587, 590 (S.D.1984)). *Accord Opp v. Nieuwsma*, 458 N.W.2d 352, 358 (S.D.1990); *Farmers State Bank of Winner v. Westrum*, 341 N.W.2d 631, 634–35 (S.D.1983).

### I. APPEALS 17782, 17805: TRIAL COURT'S DETERMINATION THAT DELORES WAS A WILLFUL SLAYER.

■ The trial court disqualified Delores from acquiring property or receiving any benefit from the estate as a willful slayer pursuant to SDCL 29–9–2 (1984). Delores argues the trial court was clearly erroneous in determining she was a willful slayer within the terms of SDCL 29–9–2.

SDCL 29–9–2 provides:

Neither the slayer nor any person claiming through him shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in this chapter.

A "slayer" is defined as "any person who intentionally and unlawfully takes or procures to be taken the life of another[.]" SDCL 29–9–1 (1984).

The trial court found Delores conspired with Jerry and Darlene to kill Gibbs. It reasoned her participation in the pillow experiment is evidence of an act from which

---

**2.** SDCL 30–7–8 provides:

The fees and expenses must be paid by the party contesting the validity or probate of the will, if the will in probate be confirmed. If the probate be annulled and revoked, the costs must be paid by the party who resisted the revocation, or out of the property of the decedent, as the court directs.

it can be reasonably inferred Delores intended to participate in the unlawful enterprise. The trial court concluded Delores procured the death of Gibbs within the meaning of SDCL 29–9–2 and was therefore disqualified from acquiring any money, property, or benefit of any kind, from his death.

▮▮▮ As this is a civil, not a criminal case, the standard of proof necessary under the South Dakota willful slayer statute is a preponderance of the evidence, not the higher proof of guilt beyond reasonable doubt.[3] It is not disputed for purposes of this appeal that Jerry and Darlene conspired to and did unlawfully and intentionally kill Gibbs. Darlene admitted she held Gibbs's arms down, and Jerry admitted that he smothered Gibbs with a pillow. The issue presented is whether the trial court was clearly erroneous in concluding Delores was a party to the conspiracy or otherwise procured the death of Gibbs.

It is well settled that where the existence of a conspiracy is shown, only slight additional evidence is required to connect a particular defendant with the conspiracy. A single act may be the foundation for drawing an actor within the ambit of a conspiracy if that act is such that one may reasonably infer an intent to participate in the unlawful enterprise.

16 Am.Jur.2d *Conspiracy* § 40, at 254–55 (1979). Furthermore, in 23 C.J.S. *Criminal Law* § 999 (1989), it is stated:

In order to [characterize] one an accomplice to a crime, it is essential that he participate in some manner in the commission of the offense charged, and someone who participates either before, during, or after the commission of the crime, is an accomplice....

Mere association with [an] accused does not make one an accomplice. Likewise, mere approval of a crime after the event does not [render] one an accomplice.

. . . .

As a general rule, presence at the scene of a crime, in and of itself, does not make a person an accomplice. However, where defendant is present at the scene of a crime, any conduct promoting or facilitating, however slightly, the commission of a crime, will make one an accomplice, and presence at the scene of a crime is a fact which, together with other facts, may support a finding that defendant acted as an accomplice.

(footnotes omitted). *Accord State v. Robb*, 303 N.W.2d 368, 371 (S.D.1981); *State v. Schafer*, 297 N.W.2d 473, 476 (S.D.1980).

We believe sufficient evidence was introduced to warrant the trial court's conclusion by a preponderance of the evidence that Delores, as a co-conspirator, procured the death of Gibbs within the meaning of SDCL 29–9–2. According to Jerry's testimony, six to ten discussions were held in Delores' presence regarding Darlene's activities which consisted of altering and mixing Gibbs' medications in an attempt to cause his death. Moreover, Jerry testified via deposition that, in mid-March 1990, Darlene was discussing how quick and easy it would be to smother Gibbs using a pillow. Delores procured a pillow from her bedroom and handed it to Jerry so he could test this theory on Darlene. Delores admitted to this in her own deposition. This occurred approximately one week prior to Gibbs' death. While Jerry and Darlene smothered Gibbs, Delores sat at a table a few yards away with her back turned. She admitted she knew what was happening. After the murder was completed, Delores walked over and hugged Jerry. Finally, Delores offered the will for probate and

---

**3.** The fact that Delores was acquitted of criminal charges of conspiring to murder Gibbs is not dispositive on the issue of conspiracy under the civil willful slayer statute. Although not briefed or argued by either party, the better reasoned authorities hold criminal conviction is not a prerequisite to application of the slayer statute. A person may be acquitted of criminal charges because guilt is not proven beyond a reasonable doubt but, nonetheless, may be shown in a civil cause of action to be a "willful slayer." Proof in a civil case need only be by a preponderance of the evidence. *In re Estate of Eliasen*, 105 Idaho 234, 668 P.2d 110, 118 (1983); *Leavy, Taber, Schultz and Bergdahl v. Metropolitan Life Ins. Co.*, 20 Wash.App. 503, 581 P.2d 167, 169 (1978). *See also McClure v. McClure*, 184 W.Va. 649, 403 S.E.2d 197, 201 (1991).

testified at the will contest regarding Gibbs' death. She did not disclose the true circumstances surrounding Gibbs' death until six months later, when she was confronted by Special Agent Overturf of the D.C.I.

Delores defends her actions by claiming she was afraid of Jerry. However, Delores wrote several letters to Jerry in the fall of 1990 which suggest no fear of Jerry existed and that she was romantically involved with Jerry by choice.[4] Moreover, Delores' claims of fear based on physical harm are refuted by daughter Robyn's testimony, the transcript of which was admitted without objection at the second trial. At most, on this point, Delores has raised a conflict in the evidence which the trial court has resolved against her. We cannot say the trial court's resolution of this issue is clearly erroneous. *See Estate of Till,* 458 N.W.2d at 523; *Estate of Burk,* 468 N.W.2d at 408–409; *Estate of Hobelsberger,* 85 S.D. at 289, 181 N.W.2d at 459.

During the criminal proceedings initiated against Delores, Delores was evaluated by Dr. Steven Manlove, a psychiatrist. While he found Delores to be competent and sane, he also found evidence of limited intellectual functioning and of a personality disorder. He stated in his findings:

5. Delores Christenson has a Histrionic Personality Disorder. Individuals with Histrionic Personal Disorder are reliant on those around them for their self-esteem. Since she is reliant on others for her self-esteem the people around her would have a greater effect than average on her ability to exercise independent thought and choice at the time of the alleged crime. Her Histrionic Personality Disorder renders her more susceptible to coercion or control by others.

6. Delores Christenson functions in the borderline range of intellectual functioning.

Despite this condition, the trial court found Delores' act of getting the pillow and handing it to Jerry was of her own volition and was neither solicited nor commanded by either Jerry or Darlene. The trial court found this evidenced agreement and a willingness on her part to participate in the plan to kill Gibbs.

Delores argues, because of her personality disorder, she fits within the confines of SDCL 22–3–1(5) (1988),[5] persons who commit an act "while under involuntary subjection to the power of superiors." Such persons are not subject to *criminal* accountability.

Delores' argument is not supported by authority and is not well taken. We are not dealing with criminal responsibility, but with a civil statute which disqualifies a person who procures the death of a testator from reaping the benefits of that death. Moreover, the evidence indicated Delores interjected herself into the conspiracy by voluntarily procuring a pillow to assist Jerry and Darlene in practicing to smother Gibbs.

In summation, Delores' claim she was just an innocent bystander and not an accomplice is without merit. She affirmatively participated in the murder of Gibbs by voluntarily participating in the practice run, by failing in any way to object to the discussions preceding Gibbs' murder, by failing to report Jerry and Darlene's hideous plan to police despite having had ample opportunity to do so, by sitting quietly by as Jerry and Darlene murdered Gibbs, and by assisting in covering up the murder for approximately nine months. We cannot conclude the trial court was clearly erroneous in granting Boettner's petition to disqualify Delores as a willful slayer.

----

**4.** Delores and Jerry engaged in regular sexual intercourse which was approved of or acquiesced in by Jerry's wife, Darlene.

**5.** SDCL 22–3–1 provides in pertinent part:
Any person is capable of committing a crime, except those belonging to the following classes:

. . . .

(5) Persons who committed the act or made the omission charged while under involuntary subjection to the power of superiors.

## II. APPEALS 17805, 17816: TRIAL COURT'S AWARD OF ATTORNEY'S FEES.

After the second trial, conducted in July 1991, Delores' attorney, Cain, itemized his time expended and expenses incurred during both trials defending the attacks made on the January 1990 will. The trial court entered an order authorizing the administrator to pay Cain $4,757.20 for the time and expense associated with the first trial, resulting in admission of the will to probate, and $6,034.63 for the time and expense associated with defending Boettner's petition to revoke probate of the will.

Boettner argues Cain must claim payment of attorney fees and costs through Delores. Thus, the issue presented is whether payment of the attorney fees and costs out of the estate constitutes a benefit to Delores as a result of the decedent's death, within the meaning of SDCL 29-9-2. We conclude it does.

SDCL 29-9-19 (1984) provides the framework for our analysis of this issue. It provides:

This chapter [disqualification of willful slayer] shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his own wrong.

SDCL ch. 29-9, enacted by the legislature in 1937, is a codification of the common law of South Dakota which already provided for disqualification of willful slayers. *DeZotell v. Mutual Life Ins. Co. of New York*, 60 S.D. 532, 245 N.W. 58 (1932), was decided before the adoption of the slayer statute. *DeZotell* implemented the following public policy against willful slayers:

We think that the principle of sound public policy which demands that a sane, felonious killer should not profit by his crime should be applied as often as and whenever any claim is made by such killer, whether under contract, will, or statute.... We cannot persuade our-

selves that there was ever any legislative intent that our statutes of descent and succession, general or special, however broad and unambiguous and lacking in exceptions in their terms, should operate in favor of a sane, felonious killer. We announce it as the law of this state that such statutes will not be permitted so to operate unless and until the Legislature shall specifically and affirmatively so enact.

*Id.* 60 S.D. at 548, 245 N.W. at 65.

*In re Estates of Josephsons*, 297 N.W.2d 444 (N.D.1980), the North Dakota Supreme Court was confronted with a somewhat similar dilemma. In that case, the minor son had caused the death of his parents by felonious means and was held not to be entitled to inherit from his parents under North Dakota's slayer statute. The minor argued that, even if he was disqualified from inheriting from his parents, he was nonetheless entitled to support from his parents under two North Dakota statutes, the first requiring a parent to support a child, and the second transferring such duty to the parent's estate upon the parent's death, if the parent left an estate sufficient for the child's support. The North Dakota Court rejected this argument and held:

The controlling statute is Section 30.1-10-03(1), N.D.C.C., which provides that an heir who feloniously and intentionally kills the decedent 'is not entitled to any benefits ...' Support payments from the estate, even until the age of majority, would constitute 'benefits' from the estate and would be directly contrary to statute.

*Id.* at 449-450.

Delores claims attorney fees through SDCL 30-25-6 (1984), which provides for the allowance to the executor or administrator of all necessary expenses in the care, management and settlement of the estate.[6] In addition, she claims attorney fees pursuant to SDCL 30-7-8 (1984) which provides:

**6.** We have permitted attorney fees to be awarded to beneficiaries in certain situations where the services performed were beneficial to the

estate. *In re Estate of Schuldt*, 457 N.W.2d 837, 842 (S.D.1990); *In re Bamberger's Estate*, 79 S.D. 85, 88, 108 N.W.2d 50, 52 (1961).

The fees and expenses must be paid by the party contesting the validity or probate of the will, if the will in probate be confirmed. If the probate be annulled and revoked, the costs must be paid by the party who resisted the revocation, or out of the property of the decedent, as the court directs.

The trial court confirmed probate of the January 1990 will concluding it was not a product of undue influence. However, the South Dakota slayer statute prevents Delores from receiving any benefit under that will. The payment of fees to the attorney who represented Delores' claim under the will would represent a benefit to Delores and violate SDCL 29-9-19. We therefore conclude the trial court erred in awarding to Delores her attorney fees and costs.

We find appeal # 17336 is moot. Appeal # 17779 and Notice of Review # 17782 are affirmed in part. Appeal # 17805 and Notice of Review # 17816 are reversed in part.

MILLER, C.J., and HENDERSON, SABERS and AMUNDSON, JJ., concur.