512 A.2d 389

**George Benjamin FORD, Jr.**

v.

**Pearl Rose Holland FORD.**

**No. 91, Sept. Term, 1985.**

Court of Appeals of Maryland.

July 25, 1986.

Rignal W. Baldwin, Jr. (Miller, Brassel & Baldwin, P.A., on brief), Annapolis, for appellant.

Ellen Luff (Gill Cochran, on brief), Annapolis, for appellee.

Argued before SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

## I

Pearl Rose Ford murdered her mother, Muriel L. Holland, by stabbing her some 40 times. She wrapped the body in plastic garbage bags and deposited it in the backyard of her home. She now seeks to obtain the property left her under her mother's will. George Benjamin Ford, Jr., her son, asserts that Pearl forfeited her entitlement to the property by the matricide and claims the property as the alternative beneficiary named in the will. The Orphans' Court for Anne Arundel County, in which the will was admitted to probate, ruled that George "be declared the heir" of the estate. The Circuit Court for Anne Arundel County, on appeal by Pearl to it, decided that Pearl was entitled to the property. We ordered that a writ of certiorari be issued to the Court of Special Appeals, to which George appealed, before decision by that court.

## II

The Maryland Legislature has not enacted a "slayer's" statute establishing what principles govern when a person kills another and would be tangibly enriched by the death. This Court, however, has addressed the matter in three of its decisions: *Price v. Hitaffer,* 164 Md. 505, 165 A. 470 (1933); *Chase v. Jenifer,* 219 Md. 564, 150 A.2d 251 (1959); and *Schifanelli v. Wallace,* 271 Md. 177, 315 A.2d 513 (1974). Through these cases the Court has created in the common law of this State, the equivalent of a "slayer's"

statute, which we shall refer to herein as the "slayer's rule."

*Price* concerned an appeal from an Orphans' Court order passed in the administration of the estate of an intestate. The order excluded from participation in the distribution of the estate the heirs or personal representatives of the husband of the deceased, who, it was admitted and proved, shot and killed his wife and almost immediately thereafter committed suicide. The question before this Court was:

> Can a murderer, or his heirs and representatives through him, be enriched by taking any portion of the estate of the one murdered? 164 Md. at 506, 165 A. 470.

The Court dealt with the question as one of first impression in Maryland and noted the conflicting decisions of other courts of last resort in this country. The decisions at that time represented two views.

> One line of decisions apply the common-law principle of equity that no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity, or to acquire property by his own crime, and hold that provisions of a will and the statutes of descent and distribution should be interpreted in the light of those universally recognized principles of justice and morality; that such interpretation is justified and compelled by the public policy embraced in those principles or maxims, which must control the interpretation of law, statutes, and contracts. The other and opposite view, as expressed in those decisions which reach a different conclusion, is that, while they recognize the public policy of the common law as declared in the principles and equitable maxims above set forth, such public policy founded upon the common law has been abrogated and denied, and a new and different public policy declared by the Legislature in the enactment of statutes to direct descents and distribution, or governing the execution and effect of testamentary disposition. Some of the courts in the last mentioned group also rely upon constitutional or statutory declarations to the effect that conviction of

crime shall not work a corruption of blood or forfeiture of estate. *Id.* at 506–507, 165 A. 470.

The Court fully discussed the two views and forcefully rejected any view which would "result in sanctioning the enrichment of the perpetrator of the most heinous murder from the estate of his victim." *Id.* at 516–517, 165 A. 470.

Suffice it to say that we decline to follow the reasoning supporting any interpretation fraught with consequences so pernicious and so abhorrent to the sense of justice, equity, and morality entertained by what we are pleased to believe is the overwhelming majority of thoughtful and moral people, but prefer to give expression and adherence to the principles and reasoning so forcibly presented by those courts who have in the past adopted the views ... expressed [in the common law]. *Id.* at 517, 165 A. 470.

We observed in *Chase v. Jenifer,* 219 Md. at 567, 150 A.2d 251, that the decision in *Price,* which "was rested upon the maxim that one cannot profit by his own wrong, and on a broad ground of public policy of the common law," was perhaps not then supported by a majority of the courts dealing with the question. "Nevertheless," we declared, "we regard the decision of the Maryland Court [in *Price* ] as settled law." *Chase,* 219 Md. at 567, 150 A.2d 251. Thus, it is the basic rule of this State that a murderer, or his heirs or representatives through him, ordinarily may not profit by taking any portion of the estate of the one murdered.

The Court in *Price* indicated that "the equitable maxims of the common law" which it followed in answering the question before it, would apply not only in the case of intestacy but equally to benefits by way of wills and life insurance policies. 164 Md. at 516, 165 A. 470. *Chase v. Jenifer,* 219 Md. 564, 150 A.2d 251, involved the proceeds of a life insurance policy. The question was whether a wife, named as the beneficiary under the policy upon the life of her husband, "was disqualified from recovering the proceeds by reason of the fact that she killed her husband, was tried on a charge of murder," and was found not guilty of murder, but guilty of manslaughter. 219 Md. at 565, 150

A.2d 251.[1]  The criminal court judge had found the beneficiary not guilty of murder but guilty of manslaughter, without designating, of course, whether it was voluntary or involuntary manslaughter.[2]  It was contended in the civil proceeding that "an unintentional killing, even though unlawful and felonious," is not a bar to recovery. *Id.* at 569, 150 A.2d 251.  We did not reach that point, however, because the facts clearly supported a finding by the criminal court judge that the killing was intentional.[3]  There was "no room for a contention that the [killing] was merely negligent and unintended." *Id.* at 570, 150 A.2d 251.  We held that where the killing is both felonious and intentional, the beneficiary cannot prevail. *Id.*  In that context, we refused to distinguish between murder and manslaughter.

In *Schifanelli v. Wallace*, 271 Md. 177, 315 A.2d 513, we were presented with virtually the same question we did not reach in *Chase*—whether the named beneficiary under a life insurance policy is precluded from collecting the proceeds by reason of the fact that he *unintentionally* killed his wife, the insured;  the homicide was the result of gross negligence.. We found that "the overwhelming weight of

---

**1.**  "The case [arose] upon an interpleader filed in the equity court by the insurer, against the wife and the decedent's daughter, who had been appointed administratrix of the husband's estate." *Chase v. Jenifer,* 219 Md. 564, 565, 150 A.2d 251 (1959).

**2.**  It is well settled that manslaughter, under the Maryland law, is a felony, and distinguished from murder by the presence or absence of malice aforethought.  Manslaughter may, however, be voluntary or involuntary, depending upon the requisite intent.  The use of a deadly weapon directed at a vital part of the body may be evidence, among other facts, of a specific intent to take life.  It may also permit an inference of malice.  An unintentional killing may be manslaughter, if due to a wanton and reckless disregard of human life.  (Citations omitted).
*Chase v. Jenifer,* 219 Md. at 569, 150 A.2d 251.

**3.**  We noted that even if the wife had been acquitted in the criminal trial, the holding would probably not be conclusive on the chancellor. *Chase v. Jenifer,* 219 Md. at 569, 150 A.2d 251. *See United States v. Burns,* 103 F.Supp. 690, 691–692 (D.Md.), *aff'd,* 200 F.2d 106 (4th Cir.1952) (per curiam).

authority allows recovery where the beneficiary causes the death of the insured unintentionally or not feloniously." 271 Md. at 188, 315 A.2d 513 (citations omitted). We observed, on the authority of cases cited, that

> [t]he rule which prevents a beneficiary who has intentionally killed the insured from recovering on an insurance policy is grounded on the public policy against permitting a wilful and felonious killer to profit by his felony. Thus, it has no application where even though the acts of the beneficiary cause death, they are without the intent to do so, *Tippens v. Metropolitan Life Ins. Co.,* [99 F.2d 671 (5th Cir.1938)] *supra;* where the death is the result of accident, or even when caused by such gross negligence on the part of the beneficiary that he is guilty of involuntary manslaughter, the beneficiary may still recover, *Commercial Travelers Mutual Acc. Ass'n v. Witte,* [406 S.W.2d 145 (Ky.1966)] *supra;* the basic rule is that while a beneficiary cannot recover where the death of the insured has been intentionally caused by his act, if it is the result of carelessness and is not intentional, the beneficiary's rights under the policy are not barred....

*Id.* [271 Md.] at 188–189, 315 A.2d 513 (citations omitted). We held that the husband (the beneficiary) was not barred from recovering the policy proceeds merely because the death of his wife (the insured) "was the result of his gross negligence where that determination was accompanied by an express finding that the death was caused unintentionally." *Id.* at 189, 315 A.2d 513.

As established by *Price, Chase* and *Schifanelli,* the present status of the law of Maryland is:

1) A person who kills another

    a) *may not* share in the distribution of the decedent's estate as an heir by way of statutes of descent and distribution, or as a devisee or legatee under the decedent's will, nor may he collect the proceeds as a beneficiary under a policy of insurance on the decedent's life when the homicide is felonious and intentional;

b) *may* share in the distribution of the decedent's estate as an heir by way of statutes of descent and distribution, or as a devisee or legatee under the decedent's will and *may* collect the proceeds as a beneficiary under a policy of insurance on the decedent's life when the homicide is unintentional even though it is the result of such gross negligence as would render the killer criminally guilty of involuntary manslaughter.

2) These principles apply not only to the killer but to those claiming through or under him.

3) The disposition of a criminal cause is not conclusive of the character of the homicide or of the criminal agency of the putative killer in a civil proceeding concerning entitlement to assets of the decedent.

a) It is not dispositive that no criminal prosecution was brought against the alleged killer, or that charges against him were dismissed on constitutional, statutory or procedural grounds or otherwise, or that, upon a criminal trial he was found not guilty for whatever reason, or was convicted of murder in the first or second degree or of manslaughter.

b) In the determination of who is entitled to the assets of the decedent, whether the alleged killer was the criminal agent and whether the homicide was intentional and felonious or unintentional is a function within the ambit of the civil proceeding. In short, the lack of or result of a criminal proceeding is not res judicata in a subsequent civil action.

### III

It is not disputed that Pearl killed her mother and that under the criminal law she was guilty of first degree murder in that the homicide was "wilful, deliberate and premeditated." Md.Code (1957, 1982 Repl.Vol.) Art. 27, § 407. Were this the posture of the case, it is clear that under the "slayer's rule" adopted by the *Price-Chase-Schifanelli* trilogy, Pearl would be precluded from sharing in the estate of her victim; her conduct would be both feloni-

ous and intentional. But in addition to the fact that Pearl was the criminal agent of a first degree murder, it is also undisputed that at the time the crime was committed, she was not criminally responsible by reason of insanity.[4] In short, she stands as guilty of murder in the first degree but insane. *See generally Pouncey v. State*, 297 Md. 264, 465 A.2d 475 (1983) (Criminal defendant can be found both guilty of the crime and insane at the time of its commission). The question is, therefore, what impact does the fact that Pearl was "insane" at the time she committed the crime have on the "slayer's rule" established by *Price-Chase-Schifanelli?*

The Maryland Legislature has substantially changed the definition and consequences of "criminal insanity" from the concept of the common law evidenced by the M'Naghten-Spencer rule. *See* Acts 1967, ch. 709; Acts 1970, ch. 407; Acts 1982, ch. 21; Acts 1984, ch. 501; *see also, Pouncey v. State, supra; Langworthy v. State*, 284 Md. 588, 399 A.2d 578 (1979), *cert. denied*, 450 U.S. 960, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981); *Spencer v. State*, 69 Md. 28, 13 A. 809 (1888); *Young v. State*, 14 Md.App. 538, 288 A.2d 198 (1972). The M'Naghten-Spencer test of responsibility for criminal conduct came to be expressed as whether the accused had the capacity and reason to distinguish between right and wrong and understand the nature and consequences of his acts as applied to himself. *Bradford v. State*, 234 Md. 505, 510, 200 A.2d 150 (1964). Under this test, *mens rea* cannot exist without sanity. In other words, insanity as defined under M'Naghten-Spencer "involves the *mens rea* or intent which is an essential element of the offense which the State must prove." *Id.* at 514, 200 A.2d 150. It follows that if an accused is found to be insane under that test, he must be acquitted for he did not have

---

4. According to facts stipulated before us, Pearl is confined in Crownsville Hospital Center. Psychiatric evaluations of her "indicate that she suffers from schizophrenia of the paranoid type and is a seriously disturbed individual who probably will never recover from her present condition."

the requisite intent so as to make his conduct criminal, and thus could not be said to have committed a crime.

The statutory definition of "criminal insanity" which supplanted the M'Naghten-Spencer test, is, as in effect today and at the time Pearl murdered her mother, that

[a] defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

(1) To appreciate the criminality of that conduct; or

(2) To conform that conduct to the requirements of law.[5] Md.Code (1982, 1985 Cum.Supp.) § 12–108 (a) of the Health-General Article.

We have declared that, unlike a finding of insanity under the M'Naghten-Spencer test, under the statutory test

the clear legislative intent regarding the successful interposition of a plea of insanity is not that an accused is to be found not guilty of the criminal act it was proved he committed, but that he shall not be punished therefor. *Langworthy*, 284 Md. at 598, 399 A.2d 578.

We noted in *Langworthy* that a finding that a defendant was insane at the time of the commission of the crime under the statutory test did not mean that there was no crime thereby establishing a lack of *mens rea*. We thought that neither prong of the test "is necessarily at variance with a general intent to commit a crime." *Id.* at 599 n.12, 399 A.2d 578 (citation omitted). We applied these views in *Pouncey v. State*, 297 Md. 264, 465 A.2d 475. In that case a mother drowned her child and was convicted of first degree murder and found to be insane at the time of the commission of the crime. We declared that a criminal defendant may be found guilty but insane. *Id.* at 269, 465 A.2d 475. We explained that

---

**5.** This is in substance the definition spelled out in Acts 1970, ch. 407. Acts 1982, ch. 21 and Acts 1984, ch. 501 made no material change applicable in the context of the discussion here.

a finding of insanity is not tantamount to an absence of *mens rea,* or inconsistent with a general intent to commit a crime. In drowning her child, the [mother] specifically intended to kill him,[6] and while her successful insanity defense means that she is not criminally responsible for her conduct, that determination merely relieves her of liability for punishment under the criminal law. No criminal sentence may ever be entered on the guilty verdict in this case and the appellant, therefore, does not stand 'convicted' of the murder offense in the traditional sense of the criminal law. *Id.* at 269–270, 465 A.2d 475.

The comments of the Governor's Task Force to Review the Defense of Insanity, which proposed the legislation enacted by Acts 1984, ch. 501, support this view. With respect to the test for insanity set out in § 12–108(a) of the Health Article, the Task Force commented:

The traditional theory that an insanity defense if proved means that the defendant was mentally incapable of forming criminal intent is not an established fact under the definition of criminal responsibility in § 12–108 of [the Health-General Article]. '... as presently defined, neither prong of the insanity defense—either lack of capacity "[t]o appreciate the criminality of one's conduct" [§ 12–108(a)(1) of this title] or the lack of capacity "[t]o conform that conduct to the requirements of law" [§ 12–108(a)(2) of this title]—is necessarily inconsistent with *general* criminal intent. Second, the volitional prong—the lack of capacity "[t]o conform one's conduct to the requirements of law" [§ 12–108(a)(2) of this title]— does not necessarily affect the person's ability to form a particular specific *criminal* intent.' Code (1982, 1985 Cum.Supp.) Task Force Comment following § 12–109 of the Health-General Art. at p. 110 (emphasis in original).

---

**6.** The evidence at the trial disclosed that the mother drowned her child because she believed that the devil was pursuing him and that the only way to prevent him from going to hell was to kill him. *Pouncey v. State,* 297 Md. 264, 265, 465 A.2d 475 (1983).

In light of this, the reason for the procedure to be followed upon receipt of a plea of not guilty and an additional plea of "not criminally responsible by reason of insanity"—Health-General Art., § 12–109(a)(2); Md.Rule 4–242(a)—is readily apparent. Section 12–109(c) provides:

> If the trier of fact finds that the State has proved beyond a reasonable doubt that the defendant committed the criminal act charged, then, if the defendant has pleaded not criminally responsible, the trier of fact separately shall find, by a preponderance of the evidence, whether the defendant was at the time criminally responsible or not criminally responsible by reason of insanity under the test for criminal responsibility....

This provision, according to the Task Force, merely clarifies the current state law. "[T]he trier of fact first determines whether the State proved beyond a reasonable doubt all the elements of the crime. The determination is made before considering the plea of not criminally responsible." Code (1982, 1985 Cum.Supp.) Task Force Comment to § 12–109(c) of the Health-General Art. at p. 110. The Task Force adds: "If the [trier of fact] finds the defendant not guilty, there is no determination made of the plea of not criminally responsible." *Id.* We discussed in *Pouncey* the effect of a determination that a defendant was not criminally responsible. We said:

> The legislature, however, has not seen fit to remove all consequences of committing a criminal act while insane, *e.g.*, the defendant may be held in a mental institution until it is determined that a release would not constitute a danger to the individual or to the person or property of others.... There is thus no support for the view that noncriminal collateral consequences are in all circumstances inconsistent with guilty but insane verdicts. 297 Md. at 270, 465 A.2d 475 (citation omitted).

This view is also supported by the Task Force. Its Comment to § 12–108(a) setting out the test for "insanity" is that the test is phrased to make clear

to the defendant, the jury, and to society that the defendant remains morally and personally responsible for committing criminal acts, but the State does not hold a defendant subject to criminal punishment, if this test is met. Code (1982, 1985 Cum.Supp.) Task Force Comment to § 12–108 of the Health-General Art. at p. 108.

### IV

■ Pearl Rose Ford went to trial before a jury in the Circuit Court for Anne Arundel County on pleas of not guilty and "not guilty by reason of insanity." While the jury was deliberating its verdicts (four days were consumed before the case went to the jury) she "moved to enter a plea of not guilty by reason of insanity." The court accepted the plea and took the case from the jury. A docket entry reads that Pearl "waived right to jury in open Court" and reflects the verdicts rendered by the judge in these words:

> Finding: That there was sufficient evidence to establish the defendant's guilt if sane. That the defendant is not guilty by reason of insanity.

The court committed her to the Department of Health and Mental Hygiene for examination and evaluation and subsequently ordered that she be treated on an in-patient basis at Crownsville Hospital Center until further order.[7] Although the verdicts as rendered could have been better expressed in light of the existing law, we are satisfied that to all intent and purpose, they were in accord with the required procedure as the equivalent of "Guilty of murder in the first degree" and "Not criminally responsible by reason of

---

7. Pearl Rose Ford noted an appeal to the Court of Special Appeals from the judgment entered in her criminal trial. She questioned the propriety of the judgment, however, only on a narrow procedural ground. She contended that the court erred in denying her motion to dismiss the indictment for violation of former Rule 746, which required that a trial date be set not later than 180 days after the appearance of counsel. The Court of Special Appeals affirmed the judgment in an unreported per curiam opinion, *Ford v. State*, No. 144, September Term, 1984, filed 5 November 1984. No petition was submitted to this Court for the issuance of a writ of certiorari.

insanity under the test for criminal responsibility." In other words, the verdicts were, in effect, albeit not literally, "guilty" and "insane." A judge is assumed to know the law. *State v. Babb*, 258 Md. 547, 550–551, 267 A.2d 190 (1970); *Lapides v. Lapides*, 50 Md.App. 248, 252, 437 A.2d 251 (1981). Here, the appropriate verdicts consistent with the judge's findings were "guilty" and "insane," and we so consider them. The subsequent disposition of Pearl by the judge is in accord with this view.[8]

## V

The orderly way for the civil proceeding in the circuit court[9] to be conducted in circumstances comparable to those here would be for the claimant to establish *prima facie* his entitlement to the property by proving the validity of the will and his designation as legatee. Then the burden would shift to the person protesting his claim. The protester would attempt to prove by a preponderance of the evidence that the claimant had killed the testator and that the homicide was felonious and intentional, so that under

---

8. We noted in *Langworthy v. State*, 284 Md. 588, 599 n. 12, 399 A.2d 578 (1979), *cert. denied*, 450 U.S. 960, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981), that after the M'Naghten-Spencer test was jettisoned by the legislature of Maryland, a "reference to 'not guilty by reason of insanity' [was] a holdover from common law concepts and prior statutory provisions regarding insanity and the commission of crimes."

The Governor's Task Force to Review the Defense of Insanity recommended avoiding the terms "insane" and "insanity." It recognized, however, that they "are legal terms that convey long-understood concepts of the law" so that there is "unpreventable carryover" of them. Md.Code (1982, 1985 Cum.Supp.) Task Force Comment to § 12–109 of the Health General Art. at p. 109.

9. Instead of a direct appeal to the Court of Special Appeals a party may appeal to the circuit court for the county from a final judgment of an orphans' court.

The appeal shall be heard de novo by the circuit court. The de novo appeal shall be treated as if it were a new proceeding and as if there had never been a prior hearing or judgment by the orphans' court. The circuit court shall give judgment according to the equity of the matter. Md.Code (1973, 1984 Repl.Vol.) § 12–502(a) of the Courts and Judicial Proceedings Article.

the slayer's rule the claimant would be excluded from the distribution of the estate. The claimant would defend against this by evidence refuting his guilt of felonious and intentional homicide or by establishing that, if he did commit it, at the time of its commission, he lacked the capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law because of a mental disorder or mental retardation. The judge would then make the necessary findings of fact, apply the applicable law, and render a decision.

In the case *sub judice* the validity of the will was established by its admission in probate, and the entitlement of Pearl was *prima facie* shown by her designation in the will as a beneficiary. It was undisputed that Pearl was the criminal agent in the first degree murder of her mother and that at the time of the matricide she was criminally insane. The judge presiding at the civil proceeding accepted those facts as undisputed. He recognized that he was not bound by the verdicts of the criminal court. Then he went astray however. He believed that because Pearl was criminally "insane" at the time of the killing, no crime was committed. He correctly observed that Pearl had been indicted for murder in the first degree. That the charge entailed willfulness, deliberation and premeditation, and that in order to prove those elements "the State must prove that the Defendant had 'the actual intent, the fully formed purpose to kill'...." But then he said that "[i]nsanity involves the *mens rea* or intent, which is an essential element of a crime." He concluded: "Mrs. Ford, who was insane at the time of the killing, was incapable of forming the requisite intent for first degree murder." It is clear that this conclusion was based solely on the fact that Pearl lacked substantial capacity to appreciate the criminality of her conduct or to conform that conduct to the requirements of law. In other words, the judge believed that the fact that a person was criminally insane, as now defined, at the time of the commission of an offense was necessarily inconsistent with criminal intent. This concept led inescapably to the result

that, *as a matter of law,* no crime was committed.[10]  While this view may have been sound when criminal responsibility was tested under the M'Naghten-Spencer standard, it is not correct under the present standard.  As we have seen, now it is encumbent upon the judge to find as a fact by a preponderance of the evidence whether the killer intended to kill.  Of course, the lack of or result of criminal proceedings, although not necessarily dispositive of a subsequent civil proceeding, has probative value as a factor to be considered.  In any event, the judge, on the incorrect premise that Pearl was *legally* incapable of the requisite intent by reason of her mental condition, deemed that her conduct was unintentional, and looking to *Schifanelli v. Wallace,* 271 Md. 177, 315 A.2d 513, decided that her conduct did not preclude her from receiving a share under her mother's will.[11]

---

**10.**  There is nothing in the record before us to support a factual finding that Pearl did or did not intend to kill her mother.  The record before us does not include a transcript of the criminal proceedings.  The record from the orphans' court gives no help in this regard nor does the transcript of the proceedings on appeal to the circuit court.  The reports of the psychiatric examinations made of Pearl state that she persistently denied that she had anything to do with her mother's death, merely asserting that her mother had been missing.  The reports show that she suffered delusions such as that she had been married to the movie star Omar Shariff at age seven, that Gary Coleman of television fame was her son, and that some 40 years ago her mother had poisoned her father.  The examiners were of a mind that at the time of the commission of the offense she was suffering from a mental disorder of such severity that it caused her to lack the capacity to appreciate the criminality of her conduct, or to conform her conduct to the requirements of law.

**11.**  Apparently, the judge hearing the appeal in the civil proceeding construed the verdicts in the criminal proceeding to be an outright acquittal of the murder charge.  The opinion of the civil proceeding judge ended thusly:

> In closing, this Court wishes to make clear that it is dealing only with the case before it, i.e., a person found not guilty by reason of insanity.  This Court is aware that Maryland recognizes the adjudication of a person as 'guilty but insane' and it expresses no opinion regarding whether such person may inherit from her victim's estate.

As we see it, when this case is put in proper perspective in light of the applicable law, an opinion regarding whether a person who is guilty

## VI

As we have seen, for the slayer's rule to be invoked the killing must have been both felonious and intentional. We have found that it is a function of the trier of fact in a civil proceeding regarding the entitlement of the assets of a decedent alleged to have been killed by a claimant to make an independent determination of the corpus delicti of the crime. The trier of fact must decide on a preponderance of the evidence whether the manner of the decedent's death was homicide, whether the homicide was murder or manslaughter and whether the claimant was the criminal agent. Unlike a criminal prosecution, the civil proceeding does not call for a determination of the degree of murder. Both first and second degree murder are per se felonious and intentional. The civil inquiry, however, must go a step further than is necessary in a criminal prosecution if the finding is that the homicide is manslaughter. *See Connor v. State,* 225 Md. 543, 558–559, 171 A.2d 699, *cert. denied,* 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961). Then the trier of fact in the civil proceeding must ascertain whether the manslaughter was voluntary or involuntary. Manslaughter generally, be it voluntary or involuntary, is a felony. Code, Art. 27, § 387. *See supra* note 2. *But see* Code, Art. 27, § 388. Voluntary manslaughter is intentional; involuntary manslaughter is, by definition, unintentional. *Rolfes v. State,* 10 Md.App. 204, 207, 268 A.2d 795 (1970). *Schifanelli,* 271 Md. 177, 315 A.2d 513, teaches that if the killing is unintentional it is without the ambit of the slayer's rule even though it is felonious. If the civil inquiry were to stop here, a determination that the killing was homicide, that the homicide was murder or voluntary manslaughter and that the claimant was the criminal agent would raise the bar of the slayer's rule.

■ All the above determinations are to be made on the assumption that the claimant was responsible for his crimi-

---

but insane may inherit from the victim's estate is required. That issue is the crux of this case.

nal conduct, that he was "sane" at the time of the commission of the killing. The inquiry continues, however, upon the suggestion that the killer was "insane" within the meaning of our criminal responsibility law at the time he committed the offense.[12] The trier of fact must determine whether, at the time the claimant killed the decedent, he lacked substantial capacity to appreciate the criminality of that conduct, or to conform that conduct to the requirements of law, because of a mental disorder or mental retardation. If the claimant were in that category, he would not be criminally responsible for the killing. It is at this point, upon a finding that the claimant was not criminally responsible for his criminal conduct, that the question we noted *supra*, arises, namely what impact does the fact that the claimant was "insane" at the time of the commission of the crime have on the slayer's rule. The answer is that the slayer's rule is simply not applicable when the killer was not criminally responsible at the time he committed the homicide.

Our decision in *Schifanelli* supports the propriety of this view. In that case we held that the slayer's rule did not apply to bar a killer when the homicide was involuntary manslaughter and therefore unintentional, even though the felon was sane, fully responsible for his criminal conduct and convicted and punished therefore. Certainly a killer who is not responsible for his criminal conduct and as a matter of public policy cannot be punished, is no more culpable than a killer under the circumstances of *Schifanelli*.

Our view is not in conflict with the maxims which support the slayer's rule which we have judicially adopted. The rule is based upon principles of equity, justice and morality and on a broad ground of the public policy of the common law.

---

**12.** By Acts 1984, ch. 501, § 2, "[t]he defendant has the burden to establish, by a preponderance of the evidence, the defense of not criminally responsible." Md.Code, § 12–109(b) of the Health-General Article. Prior to the Act it was the obligation of the State to prove beyond a reasonable doubt that the defendant was sane.

*Chase v. Jenifer,* 219 Md. at 567, 150 A.2d 251; *Price v. Hitaffer,* 164 Md. at 511, 516–518, 165 A. 470. Equally a matter of equity, justice and morality and a reflection of public policy is the present enlighted definition of criminal insanity under which punishment for the commission of a crime is prohibited. The terms of that definition simply make the maxims prompting the rule—no one shall be permitted to profit by his own fraud, to take advantage of his own iniquity, or to acquire property by his own crime— inappropriate when a person is criminally insane. A person who suffers a mental disorder or is mentally retarded and falls under the cognitive and volitive components of the criminal responsibility statute does not, by the very terms of those components, act with an unfettered will. His conduct is controlled and his will is dominated by his mental impairment. Fundamentally, a killing is "felonious" when the homicide is a felony. In the frame of reference of the slayer's rule, however, the legislative policy regarding criminal responsibility leads to a qualification of this meaning. We believe that for a homicide to be "felonious" in the context of the slayer's rule, it must be a felony for which the killer is criminally responsible under Maryland's criminal insanity test. Therefore, if a killer is "insane" at the time he killed, the killing is not felonious in the contemplation of the slayer's rule. If the killing is not felonious, even though it may be intentional, the rule does not apply. Our view does not do violence to the broad public policies inherent in both the rule and the criminal insanity statutes. On the contrary, it furthers the principles of equity, justice and morality recognized by both the rule and the statutes.

The result that we reach is in complete accord with the decisions of our sister states which have addressed the problem. Forty-three other states have adopted by legislative enactment a slayer's rule comparable in effect to our rule, and several have embraced such a rule through its case law. *See* Appendix A. We find that the courts in only 16 of those states, however, have construed the rule, in rendering a decision or by way of *obiter dictum,* in light of

the killer's insanity. *See* Appendix B. But each and every one of those courts have reached the same result—the slayer's rule does not operate to bar a killer who, at the time of the commission of the homicide, was insane. It appears that there is unanimity in the result, even though there is no uniformity in the manner of reaching it. For example, some of the courts, especially in those jurisdictions which apply the M'Naghten definition of insanity, reason that under that test a person found to be insane is, in fact, acquitted of the criminal charge. Since he was not guilty of committing the homicide, the rule is not invoked. A popular reason given is that under the definition of insanity applicable, be it M'Naghten's or one predicated upon a mental disease, defect or disorder, a killer within that definition could not entertain the requisite intent to make his act criminal so that the homicide was not intentional or unlawful or felonious. In some of the states in which the slayer's rule speaks in terms of a "conviction" and the insanity statute permits a verdict of guilty but precludes the imposition of punishment, as does ours, the courts have concluded that since no criminal sentence may be entered on the guilty verdict, there is no judgment in the criminal cause and the killer does not stand "convicted."[13] Therefore, the killer is not within the ambit of the rule. One court simply looked to the "humane rule that an insane killer is not a murderer" as overriding the maxim against a wrongdoer profiting from an intentional wrong. *See* Appendix B under "Illinois." The short of it is that the courts in other states which we find have addressed the matter have unanimously held for a variety of reasons and upon various tests for criminal insanity that a person who is not responsible for his criminal act at the time of its commission is without the purview of a slayer's statute or rule, which, regardless of

---

**13.** We said in *Pouncey v. State,* 297 Md. 264, 269–270, 465 A.2d 475: No criminal sentence may ever be entered on the guilty verdict in this case [where the second verdict was 'insane'] and the [slayer], therefore, does not stand 'convicted' of the murder offense in the traditional sense of the criminal law.

the way it is phrased, in its effect precludes a killer from being enriched by reason of his criminal conduct. The common thread running through all the cases is that permitting the insane killer to share in the distribution of his victim's assets is consistent with the common law principle of equity which prompted the adoption of a slayer's rule in the first place.

■ We reach the same conclusion as did the circuit court but by a different route. Even though the court below did not march to the beat of the same drummer as do we in arriving at a decision, it is the judgment of the court that we review, not the reasons set out in its opinion, even though they may be incorrect. We hold that the slayer's rule does not operate to preclude Pearl Rose Ford from inheriting under the will of her victim, Muriel L. Holland. The judgment of the Circuit Court for Anne Arundel County is affirmed.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY GEORGE BENJAMIN FORD, JR.

## APPENDIX A

*Slayer's Statutes*

Ala.Code § 43–8–253 (1982 Repl.Vol.);

Alaska Stat. § 13.11.305 (1979);

Ark.Stat.Ann. § 61–230 (1971 Repl.Vol.);

Ariz.Rev.Stat. § 14–2803 (1975, Cum.Supp.1985);

Cal.Probate Code § 250 (West 1956, Cum.Supp.1986);

Colo.Rev.Stat. § 15–11–803 (1973);

Conn.Gen.Stat. § 45–279 (1985);

Fla.Stat. § 732.802(1) (1976, Cum.Supp.1986);

Ga.Code Ann. § 53–4–6 (1982);

Hawaii Rev.Stat. § 560:2–803 (1976 Repl.Vol.);

Idaho Code § 15–2–803 (1979);

Ill.Ann.Stat. Ch. 110½, § 2–6 (1978, Cum.Supp.1986);

Ind.Code Ann. § 29–1–2–12.1 (Burns 1972, Cum.Supp.1986);

Iowa Code Ann. § 633.535 (West 1964);

Kan.Stat.Ann. § 59–513 (1983);

Ky.Rev.Stat. § 381.280 (Bobbs-Merrill 1972);

La.Civ.Code Ann. art. 966 (West 1975);

Me.Rev.Stat.Ann. tit. 18–A, § 2–803 (1981);

Mich.Comp.Laws Ann. § 700.251 (1980, Cum.Supp.1986);

Minn.Stat.Ann. § 524.2–803 (West 1975, Cum.Supp.1986);

Miss.Code Ann. § 91–1–25 (1972);

Mont.Code Ann. § 72–2–204 (1985);

Neb.Rev.Stat. § 30–2354 (1985);

Nev.Rev.Stat. § 134.007 (1986);

3B N.J.Stat.Ann. 7–1 (1983);

N.M.Stat.Ann. § 45–2–803 (1978);

N.C.Gen.Stat. § 31A–4 (1984);

N.D.Cent.Code § 30.1–10–03 (1976 Repl.Vol.);

Ohio Rev.Code Ann. § 2105.19 (Page 1976, Cum.Supp.1985);

Okla.Stat.Ann. tit. 84 § 231 (1970, Cum.Supp.1985);

Or.Rev.Stat. § 112.465 (1985);

20 Pa.Cons.Stat.Ann. § 8801 (Purdon 1975);

R.I.Gen.Laws § 33–1.1–1 (1984);

S.C.Code Ann. § 21–1–50 (1977);

S.D.Codified Laws Ann. § 29–9–1 (1984);

Tenn.Code Ann. § 31–1–106 (1984 Repl.Vol.);

Tex.Prob.Code Ann. § 41(d) (Vernon 1980);

Utah Code Ann. § 75–2–804 (1978);

Ver.Stat.Ann. tit. 14 § 551(6) (1974);

Va.Code § 55–401 (1986 Repl.Vol.);

Wash.Rev.Code § 11.84.010 (1985);

W.Va.Code § 42–4–2 (1982 Repl.Vol.);

Wis.Stat.Ann. § 852.01 (2m) (1971, Cum.Supp.1985); and Wyo.Stat. § 2–14–101 (1980).

APPENDIX B

*Alabama*—Although Alabama does not specifically address the issue of insanity, its Supreme Court quotes from a South Dakota case wherein the rule was cited as: "We think that the principle of sound public policy which demands that a *sane*, felonious killer should not profit by his crime should be applied as often as and whenever any claim is made by such killer, whether under contract, will or statute." *Weaver v. Hollis,* 247 Ala. 57, 22 So.2d 525, 527 (1945) (quoting *DeZotell v. Mutual Life Insurance Co.,* 60 S.D. 532, 245 N.W. 58, 65 (1932) (emphasis added) ). The *Weaver* case was one of first impression in Alabama, hence, various foreign precedents were examined, including *Price v. Hitaffer,* 164 Md. 505, 165 A. 470 (1933). The *Alabama* court held that a husband, convicted of second degree murder, could not take an intestate share of his deceased wife's estate. The Alabama legislature later passed a slayer's statute precluding from taking one who "feloniously and intentionally kills the decedent." Ala.Code § 43–8–253 (1982 Repl.Vol.).

*California*—The California Court of Appeal specifically addressed the effect of a slayer's insanity in *Estate of Ladd,* 91 Cal.App.3d 219, 153 Cal.Rptr. 888 (1979). The slayer-mother was found guilty of the murder in the first degree of her two sons *and* insane at the time of the crimes' commissions. The mother was committed to a state institution for treatment. The issue on appeal was whether the mother was precluded from inheriting from her deceased sons' estates premised upon the California slayer's statute. The applicable statute precluded inheritance by one who "unlawfully and intentionally caused the death of the decedent...." (Note—the statutory language has since been changed to one "who feloniously and intentionally kills the decedent...." Cal.Probate Code § 250(a) (West 1956,

Cum.Supp.1986).) "Specifically, the court must determine what effect the Legislature intended a finding of insanity under Penal Code section 1026[1] to have on the issue of whether a person 'unlawfully and intentionally' caused the death of a decedent" under the slayer's statute. 91 Cal. App.3d at 223. After reviewing the legislative history of their slayer's statute, the court observed that "[i]nferably, the Legislature based these classifications [of slayers] on the mental state or culpability of the person who caused the death of a decedent, or on the punitive value of [the slayer's statute]." *Id.* at 225.

The Court then examined the procedure at the criminal trial and concluded that despite the finding of guilt, there was no "conviction" for purposes of the slayer's statute. A "conviction" under the slayer's statute was deemed to be conclusive proof of "unlawfulness."[2] The court avoided the finding of a "conviction" by reasoning that there was no judgment pronounced thereafter; instead, the defendant was deemed to be insane and committed to a state hospital. Such action was construed to be an "acquittal" for purposes of the slayer's statute. *Id.* at 225. The court further reasoned that such a conclusion was consistent with the purpose of the insanity test; that is, determining who should not be held criminally responsible. *Id.* at 226. Insane persons are not of sound mind, and, accordingly, cannot act "intentionally" for purposes of the slayer's statute. *Id.*

*Colorado*—Although the Colorado courts have not specifically addressed the plight of an insane slayer, they have noted certain exceptions to slayer's statutes, including the

---

**1.** The *Ladd* court recited the insanity defense in a footnote: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." 91 Cal.App.3d at 226 n. 2 (citation omitted) (brackets in original).

**2.** As previously noted, the Legislature later substituted the term "feloniously" for "unlawfully."

situation wherein "the person who committed the homicide was insane at the time...." *Strickland v. Wysowatcky,* 128 Colo. 221, 250 P.2d 199, 200 (1952) (citations omitted). Factually, the case concerned a slayer-husband convicted of voluntary manslaughter. The husband was allowed to take because the statute in force at that time spoke only to first and second degree murder. (It has since been amended to include manslaughter, *see* Colo.Rev.Stat. § 15–11–803 (1973).)

*Florida*—In *Hill v. Morris,* 85 So.2d 847 (Fla.Sup.Ct. 1956) the court addressed the following issue: "[W]hether or not a widow who has been duly acquitted, by reason of insanity, from a charge of murdering her husband is entitled as a matter of law to participate in his estate by way of dower." 85 So.2d at 849. The slayer's statute in force at · the time precluded inheritance by "any person convicted of the murder of a decedent...." (The legislature has since changed the statute to "a surviving person who unlawfully and intentionally kills or participates in procuring the death of the decedent...." Fla.Stat. § 732.802(1) (1976, Cum. Supp.1986).) The wife was allowed to take specifically because she was not convicted, as required by the statute. "The effect of the judgment of acquittal by reason of insanity was to establish conclusively that petitioner was not guilty of the public offense with which she was charged, because *as a matter of criminal law* she lacked the capacity to commit the crime. This should suffice to clear the record of such epithets as 'felonious killer' and the like, with which it is replete, and which are properly applicable only in the criminal law." *Id.* at 851 (emphasis in original).

*Illinois*—The issue of an insane beneficiary's right to take the proceeds of the deceased's life insurance policy was addressed in *Blair v. Travelers Insurance Co.,* 30 Ill.App.2d 191, 174 N.E.2d 209 (1961). The court held that the proceeds of the policy were not forfeited if the slayer was insane, citing the "humane rule that an insane killer is not a murderer." 174 N.E.2d at 211 (citation omitted).

Essentially, that "rule" overrides the "maxim" against a wrongdoer profiting from an intentional wrong.

*Indiana*—In *Turner v. Estate of Turner*, 454 N.E.2d 1247 (1983) the Court of Appeals of Indiana permitted an insane slayer, who shot and killed his parents but was found to be not responsible by reason of insanity, to receive his intestate share of his parents' estate and insurance proceeds. The court examined the trend of decisions permitting an insane slayer to inherit. "In finding Allen was insane, the jury in his criminal trial determined, in essence, that Allen lacked any wrongful intent when he killed his parents. Indeed, to quote from the applicable statute, Allen was found to lack the 'substantial capacity either to appreciate the wrongfulness of the conduct or to conform his conduct to the requirements of law' Ind.Code § 35–41–3–6(a)." *Id.* at 1252.

The court limited itself to the verdict of not responsible by reason of insanity—noting that such plea had been stricken by the legislature and supplanted by "guilty but mentally ill." *Id.* at 1249 n. 5. The slayer's statute was also amended to include one who is guilty but mentally ill. *See* Ind.Code Ann. § 29–1–2–12.1 (Burns 1972, Cum.Supp. 1986).

*Minnesota*—In a case decided outside of the slayer's statute, a slayer-husband was permitted to take, by way of survivorship, the property he held in joint tenancy with his deceased wife. *Anderson v. Grasberg*, 247 Minn. 538, 78 N.W.2d 450 (1956). The husband was deemed incompetent, hence, never tried in criminal court for his wife's shooting.

The court noted that Minnesota adheres to "the equitable doctrine that a person should not profit by his wrong;" and, to that end, a constructive trust may be imposed. "When the killer is insane, however, examination is necessary to determine whether the basis upon which the doctrine rests still exists." 78 N.W.2d at 456. The court noted that insanity is recognized as a defense against criminal punishment "because, if the perpetrator is so mentally diseased

that he does not have the intent or animus in the commission of the crime, the act lacks the elements which constitute the crime the law seeks to punish." *Id.* (footnote omitted). Furthermore, these principles apply equally in a civil case determining survivorship rights "for if his mind was so diseased that it was the disease and not his own will which caused the act to be committed, it cannot fairly be said that he has committed a wrong for which the law should upset the customary legal rights of property ownership." *Id.*

At the time of this case, Minnesota applied the M'Naghten test for sanity. *Id.* at 457. *See* Minn.Stat.Ann. § 611.-026 (West 1964, Cum.Supp.1986). The court did not apply M'Naghten under these circumstances noting that it "would not be appropriate in this case where the defendant apparently knew that what he did was wrong, and yet it was his mental disease and not his own conscious act that caused the death of his wife." *Id.* at 460. The judicial rule enunciated in such civil proceedings was "the slayer will not be barred from taking the property where his unlawful act was the product of mental disease." *Id.* at 461. In such an instance, the equitable doctrine precluding one from profiting from his own wrong does not apply.

*Missouri*—In *Eisenhardt v. Siegel,* 343 Mo. 22, 119 S.W.2d 810 (1938), the Supreme Court of Missouri addressed the issue of sanity in a title dispute. One brother, who was conceded to be insane at the time of the homicide, shot and killed his brother, thus triggering a reversion of title in certain property. The fact of the "murder" did not preclude the reversion for the reason that the slayer was insane. The defense of insanity, per M'Naghten, eradicated the murder, *i.e.,* since the slayer was insane there was no murder.

*New Hampshire*—In *Kelley v. State,* 105 N.H. 240, 196 A.2d 68 (1963) a husband convicted of first degree manslaughter was allowed to take property from his deceased wife when "the property she had at the time of her death

was in substance his property and the estate he inherits from her 'is considerably less than what' he has expended for her during their marriage of ten months." 196 A.2d at 71. The court reasoned that the "constructive trust" is intended to prevent unjust enrichment and hence would not apply in such circumstance. It also would not apply if the slayer was *insane*, (citing *Anderson v. Grasberg*, 247 Minn. 538, 78 N.W.2d 450 (1956)) or if the slayer had a vested interest in the property at interest. 196 A.2d at 70.

*New Jersey*—In *Campbell v. Ray*, 102 N.J.Super. 235, 245 A.2d 761 (1968), *aff'd mem.*, 107 N.J.Super. 509, 259 A.2d 473 (1969), *aff'd mem.*, 56 N.J. 52, 264 A.2d 441 (1970), the court addressed the issue of whether an insane slayer is entitled to insurance proceeds and an intestate share of her husband's estate. In answering this issue in the affirmative, the court noted that a constructive trust, applied to carry out the equitable doctrine that a person should not profit by his own wrong, is imposed to prevent unconscionability and unjust enrichment. 245 A.2d at 765. It is proper to inquire as to the doctrine's applicability if the slayer is insane. *Id.*

> So in a case where one benefits from an unlawful act, such as a killing, committed without intent because of disease of the mind, it cannot be concluded that he perpetrated the act with the end in view of profitting thereby. In such circumstances, if it was not his will that the act be perpetrated, it does not seem proper for the law to conclude that he has committed a wrong such as to bar him from receiving benefits which arise solely because of the death of an individual which in fact was not intended.

*Id.*

New Jersey applies the M'Naghten test in determining an accused's sanity. *See* 2C N.J.Stat.Ann. 4–1 (1982).

In a case decided after a slayer's statute was passed in New Jersey, an insane slayer was allowed to inherit from her husband's estate. *In re Vadlamudi Estate*, 183 N.J.

Super. 342, 443 A.2d 1113 (1982). The wife, who killed her husband with an ax, was found not guilty by reason of insanity. 443 A.2d at 1114. The issue was whether the killing was "intentional" under the slayer's statute. (Note —the current statute requires that the killing be criminal and intentional, *see* 3B N.J.Stat.Ann. 7–1 (1983).) The court held that the passage of the slayer's statute did not alter the common law approach as to insane slayers. 443 A.2d at 1116. "If a homicide was accidental or committed by the beneficiary in self-defense or while legally insane, the killing was not 'intentional' for purposes of disqualifying a beneficiary from succession to property of the decedent, and recovery was permitted." 443 A.2d at 1116–17.

*New York*—There are several New York cases allowing the insane slayer to take. *In re Eckhardt's Estate*, 184 Misc. 748, 54 N.Y.S.2d 484 (1945) is the most often cited. Mrs. Eckhardt was acquitted of her husband's murder "upon the ground that she did not know at the time the nature and quality of her act and that at the time of the trial she was sane." 54 N.Y.S.2d at 485. Initially, the court cited its adherence to the equitable maxim that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong . . . ." *Id.* at 487. The surrogate judge concluded "that legally the wife committed no wrong, not knowing at the time the nature and quality of her act and that therefore she is entitled to take as a distributee." *Id.* at 490. The wife also retained title to jointly owned properties. Again, indicating that no legal wrong had been committed by the wife, "the principle barring one from profiting from his own wrongs is inapplicable." *Id.* at 492. *See also In re Estate of Wirth*, 59 Misc.2d 300, 298 N.Y.S.2d 565 (1969). New York applies a somewhat modified version of M'Naghten. *See* N.Y.Penal Law § 40.15 (Consol.1984).

*North Carolina*—In *Quick v. United Benefit Life Ins. Co.*, 287 N.C. 47, 213 S.E.2d 563 (1975) the court addressed a wife's right to insurance proceeds following her conviction for involuntary manslaughter. In discussing a special

drafting committee's comment it was noted that "the term 'slayer' instead of felon or murderer [is used] and [the statute] is limited to 'wilful and unlawful' killings. These latter words would prevent the statute's application to cases of involuntary manslaughter, justifiable or excusable homicide, accidental killing or where the slayer was insane." 213 S.E.2d at 566.

*Pennsylvania*—A wife who allegedly killed her husband, but found to be insane and hence never tried, was allowed to share in her husband's estate despite a slayer's statute. "Letha Hoffman is insane, incapable of being tried for crime, innocent in the eyes of the law, and we conclude entitled to share presently in her husband's estate." *Hoffman's Estate*, 39 D. & C. 208, 209–10 (1940). Justice favors those who are presumptively innocent. The Pennsylvania insanity statute, 18 Pa.Cons.Stat.Ann. § 315(b) (Purdon 1983), follows M'Naghten.

*South Dakota*—As previously indicated, herein under the Alabama heading, South Dakota's slayer's rule requires that the killer be "sane" for it to apply. *DeZotell v. Mutual Life Insurance Co.*, 60 S.D. 532, 245 N.W. 58, 65 (1932).

*Texas*—An insane husband who shot and killed his wife was permitted to take his share of her estate and to collect the proceeds from her insurance policies. *Simon v. Dibble*, 380 S.W.2d 898 (Tex.Civ.App.1964). "The husband is insane, and therefore not capable of willfully taking the life of his wife." 380 S.W.2d at 899. Texas applies the M'Naghten test. *See* Tex.Penal Code Ann. § 8.01 (Vernon 1974, Cum.Supp.1986).

*Vermont*—In *In re Estate of Mahoney*, 126 Vt. 31, 220 A.2d 475 (1966), in dictum, the Supreme Court of Vermont stated that the legal fiction of a constructive trust would not apply if the killer was insane. 220 A.2d at 478. The principle behind this approach is, again, that one should not profit by their own wrong, but that principle would not be applicable if the slayer was insane or had a vested interest

in the property. *Id.* Note—Vermont has since passed a slayer's statute, *see* Ver.Stat.Ann. tit. 14 § 551(6) (1974).)

COLE, Judge, dissenting in which McAULIFFE, Judge, joins.

The majority holds that one who has wilfully, deliberately and with premeditation killed another may be enriched by inheriting from the victim's estate because the killer was found not to be criminally responsible for the murder by virtue of her insanity. In light of our state's recognition that insane criminals are guilty of the crimes they commit and are personally and morally responsible for those crimes, I find the majority's position to be untenable. I thus respectfully dissent.

This Court adopted "the slayer's rule" in *Price v. Hitaffer*, 164 Md. 505, 165 A. 470 (1933), on the basis that allowing a murderer to inherit from the estate of his victim is repugnant to public policy. The Court applied the equitable rule that "no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity or to acquire property by his own crime," *id.* at 506 and 511, 165 A.2d 470, and held that a killer, by virtue of his murderous act, acquires no beneficial interest in the estate of his victim. *Id.* at 508, 165 A.2d 470.

As the majority recognizes in Part III of its opinion, an insane murderer who has been found to have acted with the requisite intent or *mens rea* has committed the crime of murder. *See Langworthy v. State*, 284 Md. 588, 399 A.2d 578 (1978); *see also Pouncey v. State*, 297 Md. 264, 465 A.2d 475 (1983). He is guilty, and his insanity neither justifies nor excuses his act. His misdeed is equally abhorrent as a murder committed by one sane, and although the criminal consequence—imprisonment—will be dispensed with, the murderer has not been forgiven.

Our legislature has clearly shown that the purpose of adjudging the killer's sanity is not to determine whether the

crime will be annulled, but to determine whether the killer should be criminally punished. Code (1982, 1985 Cum. Supp.), § 12–108 of the Health General Article, sets forth the test for insanity:

(a) Test—*In general.*—a defendant is not *criminally responsible* for *criminal conduct* if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

(1) To appreciate the criminality of that conduct; or

(2) To conform that conduct to the requirements of the law. [Emphasis supplied.]

In its comment to § 12–108(a), the Governor's Task Force to Review the Defense of Insanity states:

the phrase "not criminally responsible" is substituted for the phrase "not responsible" [which appeared in the former test under § 12–107] as being a more accurate statement of the defendant's status under criminal law. The Task Force recommends the adoption of this term to make clear to the defendant, the jury, and to society *that the defendant remains morally and personally responsible for committing criminal acts,* but the State does not hold the defendant subject to criminal punishment, if this test is met. [Emphasis supplied.]

The reason that the insane murderer will not be criminally punished is that "the State has determined that it cannot morally punish the defendant." Governor's Task Force to Review Defense of Insanity Report 30 (1984).

A dichotomy exists, then, between the moral responsibility of the State—which dictates that it should not imprison the insane murderer, and the moral responsibility which society expects from its citizens—which dictates that an insane murderer is responsible for his crime. We recognized this dichotomy in *Pouncey v. State, supra.* In *Pouncey,* the appellant, who had drowned her son because she believed him to be pursued by the devil, was found by the trial court to be both guilty of first degree murder and insane at the time of the offense. She appealed, alleging

that the verdicts of guilty and the finding of insanity were inconsistent. This Court rejected her claim and cited *Langworthy v. State, supra,* for the proposition that a defendant may be found both guilty and insane. The appellant nonetheless sought "to avoid the effect of *Langworthy* [and] argue[d] that because 'she was ultimately found insane, the finding of guilt was divested of legal significance for purposes of her future status as a criminal or non-criminal.'" 297 Md. at 268–69, 465 A.2d at 478. The appellant further argued

> that if she is burdened by a record of conviction of first degree murder, she will in a practical sense have been found responsible for her conduct; that the stigma of such a "conviction" punishes her for her conduct in that, among other things, it prohibits her from voting, from serving on a jury, from acquiring licenses or contracts, and also inhibits future employment opportunities since prospective employers will ascertain that she was found guilty of first degree murder.

*Id.*

In this Court's view, however, such results were not incongruous with a finding of insanity. The Court observed:

> [A] finding of insanity is *not tantamount to an absence of* mens rea, *or inconsistent with an intent to commit a crime.* In drowning her child, the appellant specifically intended to kill him, and while her successful insanity defense means that she is not criminally responsible for her conduct, that determination *merely relieves her of liability for punishment under the criminal law.* No criminal *sentence* may ever be entered on the guilty verdict in this case and the appellant, therefore, does not stand "convicted" of the murder offense in the *traditional sense of the criminal law. The legislature, however, has not seen fit to remove all consequences of committing a criminal act while insane, e.g.,* the defendant may be held in a mental institution until it has determined that a release would not constitute a danger to the

individual or to the person or property of others. § 12–114(b)(1)(ii). *There is thus no support for the view that non-criminal collateral consequences are in all circumstances inconsistent with guilty but insane verdicts.*

*Id.* at 270, 465 A.2d at 478 (emphasis supplied). Thus, the Court recognized that the civil consequences of an insane criminal's act are not controlled by the fact that the person has received dispensation from criminal punishment.

Turning to the instant case, it is clear to me that the fact that the State cannot criminally punish an insane defendant is irrelevant to a determination of whether it is equitable for the killer to inherit from her victim. It is one thing to say that the State should not imprison one who was insane when she committed the murder. It is quite another to say that the insane murderer can profit from her crime. The only relevant focus here must be upon the killer's moral and personal responsibility for the crime.

As developed in *Price v. Hitaffer, supra, Chase v. Jenifer,* 219 Md. 564, 150 A.2d 251 (1958) and *Schifanneli v. Wallace,* 271 Md. 177, 315 A.2d 513 (1974), the operation of the "slayer's rule" requires two findings: that the killing was intentional and that it was committed "feloniously." With respect to the first finding, our decisions in *Pouncey* and *Langworthy,* as well as the statute defining insanity, make clear that an insane person may have the intent requisite for the commission of the crime. As to the second finding, these cases and the statute also demonstrate that an insane killer can commit a felonious act. The majority acknowledges that a killing is felonious when the homicide committed is a felony. As indicated by *Pouncey* and *Langworthy,* an insane person can be found to possess the requisite mens rea, and thus can be found guilty of committing a felony. Indeed, as evidenced by our criminal responsibility statute, the existence of the crime itself is independent of a finding of insanity. The statute requires that the State prove beyond a reasonable doubt each element of the crime *before* the issue of insanity is addressed. Thus, for

purposes of the application of the slayer's rule, a trial judge may find that a killer did in fact commit a felony and that the homicide committed was intentional without addressing the insanity issue.

I believe that our prior readings of the criminal responsibility statute reaffirm this conclusion. In *Pouncey* and *Langworthy*, we stated that the legislative intent of the statute was not to negate the existence of the crime but to relieve the insane person of liability for punishment under the criminal law. Thus, a finding of insanity under the statute in no way diminishes the wrongfulness of the actor's conduct. Rather, it merely removes the possibility of criminal sanction. Because the actor's conduct remains wrongful notwithstanding the finding of insanity, the slayer's rule, in barring an individual from profiting from his own wrong, remains applicable.

I realize that the insane killer committed the crime either because she could not appreciate the criminality of her conduct or because she could not conform her conduct to the requirements of the law. But this reason for the killer's volition has no bearing upon the equitable principle embodied in the slayer's rule. If the insane killer has intentionally killed her victim, if she has acted with the required *mens rea* for the crime, she is personally and morally responsible for her wrong, and equity demands that she shall not benefit from the deed. It is repugnant to decency to say that an insane murderer can finance her rehabilitation with new found wealth from her victim's estate.

Finally, I note that each of the cases from other jurisdictions cited by the majority is distinguishable in that no case addresses the question under an insanity law similar to Maryland law. Most of the cases cited apply either the M'Naughten standard or a similar test and hold that the "slayer's rule" does not apply either because a finding of insanity is tantamount to an acquittal, *Estate of Ladd,* 91 Cal.App.3d 219, 153 Cal.Rptr. 888 (1979); *Hill v. Morris,* 85

So.2d 847 (Fla.Sup.Ct.1956); *In re Eckhardt's Estate,* 184 Misc. 748, 54 N.Y.S.2d 484 (1945), or because an insane person cannot have the requisite intent for the murder, *Estate of Ladd, supra, Turner v. Estate of Turner,* 454 N.E.2d 1247 (Ind.App.1983); *Anderson v. Grasberg,* 247 Minn. 538, 78 N.W.2d 450 (1956); *Kelley v. State,* 105 N.H. 240, 196 A.2d 68 (1983); *Campbell v. Ray,* 102 N.J.Super 235, 245 A.2d 761 (1968), *aff'd mem.* 107 N.J. Super 509, 259 A.2d 473 (1969), *aff'd mem.,* 56 N.J. 52, 264 A.2d 441 (1970); *Quick v. United Benefit Life Ins. Co.,* 287 N.C. 47, 213 S.E.2d 563 (1973); *Simon v. Dibble,* 380 S.W.2d 898 (Tex. Civ.App.1964)). Other cases simply note that an insane killer is not a murderer, and thus the "slayer's rule" should not apply. *See Blair v. Travelers Ins. Co.,* 30 Ill.App.2d 191, 174 N.E.2d 209 (1961); *Eisenhardt v. Siegel,* 343 Mo. 22, 119 S.W.2d 810 (1938); *Hoffman's Estate,* 39 D & C 208 (1940). In contrast, under Maryland law, a killer deemed to be insane is *not acquitted* of the crime, *Langworthy, supra,* the insane killer *can* be found to have the requisite *intent* for the crime, and the killer is in essence found to be *guilty* of committing that crime. We should not blindly follow those jurisdictions which base their holdings upon standards of insanity to which our legislature has shown its express intent not to adhere.

In conclusion, I note that because Pearl Ford should be disqualified as devisee under her mother's will, her son is the appropriate substitute legatee. Although the general rule is that a murderer's heirs cannot through the murderer take from the victim's estate, *see Price v. Hitaffer, supra,* 164 Md. at 506, 518, 165 A. 470 where the heir is also an heir of the victim and the natural beneficiary of victim's bounty, he is the proper substitute beneficiary. *See* Am. Jur.2d, *Descent and Distribution* § 109 (1983). Here George Benjamin Ford, Jr., the son of the murderess, is the grandson of the victim and is the victim's only lineal descendant. Therefore, I would hold that George is the proper beneficiary of his grandmother's estate.

For these reasons, I would reverse the judgment of the circuit court.

I am authorized to state that Judge McAULIFFE concurs in the views here stated.